**AMALGAMATED TRANSIT UNION, DIVISION 1279, an unincorporated labor organization, Plaintiff,**

v.

**CAMBRIA COUNTY TRANSIT AUTHORITY, a municipal authority, Defendant.**

**Civ. A. No. 88–796.**

United States District Court, W.D. Pennsylvania.

July 19, 1988.

As Amended July 22, 1988.

Robert Brierton, Williams & Brierton, Johnstown, Pa., for defendant.

## MEMORANDUM OPINION

DIAMOND, District Judge.

Plaintiffs, a union representing bus drivers and mechanics and the union's president, seek a preliminary injunction against mandatory drug and alcohol testing during annual physical examinations. For the following reasons, we hold that defendant's testing program does not violate the Fourth Amendment's prohibition against unreasonable searches and seizures; therefore, we will deny plaintiffs' motion for a preliminary injunction.

### Facts

Based upon the evidentiary hearing we held, the following narrative constitutes our findings of facts. *See* Fed.R.Civ.P. 52(a). Plaintiffs are the Amalgamated Transit Union, Division 1279 ("the Union"), and its president, Charles Cisco. Defendant, Cambria County Transit Authority ("the Authority") is a municipal authority which provides public transportation in Cambria County, Pennsylvania. The Union is the exclusive bargaining representative of all the Authority's bus drivers and mechanics. There are 47 drivers in the Authority and 21 mechanics.

The Authority's buses operate mostly in urban areas. Bus routes run through crowded areas containing schools, hospitals, senior citizen centers, and public housing. Each bus carries up to 70 passengers. They travel at 25 to 30 miles per hour on city streets and 55 miles per hour on the highway. All drivers work alone. The driver having the first shift of the day will arrive at the garage, check in with the supervisor, inspect his bus, and start his route. Only one supervisor is on duty from 4:30 A.M. to 6:00 A.M. At six, a second supervisor joins him. At most, a supervisor may observe an individual driver ten minutes out of an eight hour shift. After the first shift, drivers switch while the bus is on the street, so a supervisor may not see some drivers at all.

Mary Jo Miller, Jubelirer, Pass & Intrieri, Pittsburgh, Pa., for plaintiff.

The witnesses at the preliminary injunction hearing could recall only five incidents since 1981 in which drugs or alcohol raised safety concerns. In 1981 a bus driver passed out at the wheel of an empty bus, struck several parked cars, and careened into a drug store. No one was hurt. The driver either had an epileptic seizure or suffered an adverse reaction to medication he was taking for epilepsy. He returned to work without incident.

In 1983, a driver was removed from a bus after driving recklessly. He was drunk. The Authority suspended him, but allowed him to return to work after he successfully completed a treatment program. This driver has continued to work without incident.

Since 1983, there have been no incidents of drug or alcohol related impairment on the job. A driver approached Harold Jenkins, executive director of the Authority, and confessed an alcohol problem and asked for help. The driver had been drinking a fifth of hard liquor each day. Nonetheless, he had never appeared to be intoxicated on the job, and, although the driver had an excessive rate of absenteeism, Mr. Jenkins considered him one of the Authority's best employees. The Authority put him through a detoxification and treatment program at its expense. He returned to work.

Two other employees were arrested off-duty for driving under the influence. Neither was disciplined, and these employees have not caused any problems on the job.

On May 14, 1987, the Authority enacted its first drug and alcohol testing policy. Plaintiff's Exhibit 1. This policy provided for testing of an employee only upon reasonable suspicion that he was using drugs or alcohol in a manner that posed a danger. A positive test would result in dismissal, as would refusal to take the test. No one was tested under this policy; the Authority never had reasonable suspicion to believe any employee was under the influence of drugs or alcohol.

On January 28, 1988, the Authority adopted a new Drug and Alcohol Policy.[1] Plaintiff's Exhibit 2. This policy's purpose is to insure employee and passenger safety by fostering a work environment free of the effects of alcohol and controlled substances. Moreover, the policy aims to help those employees with a drug and alcohol dependency and to return them to productivity.

The policy contemplates testing of urine and blood for drug and alcohol in several contexts. Testing may be required upon individualized reasonable suspicion. The Authority conducts a pre-employment drug and alcohol test and another test during a new employee's probationary period. If an employee enters a drug or alcohol dependency treatment program, he will be subject to three random tests for one year following the completion of his treatment.

The Union does not challenge any of these tests. Rather, it confines its request for a preliminary injunction to the Authority's policy of taking and testing urine and blood samples for drugs and alcohol during each employee's required annual physical examination.

Every employee must submit to a medical examination in the month of his anniversary with the Authority. Thus, the employee has notice from the day he starts work of when he will be tested. For at least twelve years, the Authority has required an annual examination, and every one of these examinations has involved the taking and testing of blood and urine. Not until this year, however, has that testing included probes for drugs and alcohol.

Under the current Drug and Alcohol Policy, the employee reports to Lee Hospital with a testing requisition form from Dr. McQuillen, the Authority's doctor. A laboratory worker enters the employee's name next to a number in a log book kept under lock and key. The sample and the forms accompanying it bear that number only, not the employee's name. The employee

---

1. The Authority maintains, honestly we believe, that this policy was adopted in anticipation of federal regulations requiring local transit systems to enact such policies. Yet, no one has directed us to these regulations.

then goes into a bathroom alone and, unobserved, fills a container with urine. A laboratory technician draws blood from the employee.

Lee Hospital performs an EMIT screening test[2] on the blood and urine samples.[3] The test determines the presence of ten specified substances, and nothing else. *See* Defendant Exhibit D. This test will not reveal other personal information, such as whether the employee is pregnant. Among the substances which the test will reveal are alcohol, opiates, cocaine, and cannabinoids.

If the EMIT test is negative, that is, if it does not reveal the presence of any of the specified substances, no further tests are performed, and that result is reported to Dr. McQuillen as final. If the result is positive, that is, if it detects the presence of one of the specified substances beyond a threshold level, Lee Hospital sends the samples, identified only by number, to Roche Laboratory for a GC/MS confirmatory test.

Roche reports its results to Lee Hospital. If the GC/MS is positive, Lee Hospital conveys this to Dr. McQuillen. This is the first time anyone in the Authority learns of the test result. If the GC/MS is negative, Lee Hospital instructs Dr. McQuillen that the negative result is to be taken as conclusive. Lee Hospital retains a portion of all samples that test positive for 18 months. Any employee who tests positive may have his own test run on the sample to challenge the rests.

Dr. McQuillen discusses a positive result with the employee. The doctor reports the result to Harold Jenkins, the Authority's executive director, and Mike Noel, the Authority's assistant general manager. No one else within or without the Authority learns of the test result; it is never reported to the police or prosecutor.

The Authority refers the employee to Mercy Hospital in Johnstown. The hospital examines the employee and prescribes an assistance program for him. The employee must undergo the program; refusal will result in termination. The Authority pays for the program. During the program, the employee is relieved of his duties, but he receives full pay so long as he has benefit days. If he uses all his benefit days before he completes the program, the employee is put on sick leave. Sick leave may last up to six months, and the employee receives $600 per month, approximately one-fourth of the usual monthly pay.

The employee suffers no adverse employment action if he successfully completes the rehabilitation program. He may return to work at his prior level and pay. However, for one year following completion of the program, the employee is subject to three random drug and alcohol tests. If the result is positive, termination is automatic. Employees who maintain a good record for three years after completion of the program may request that all records pertaining to their drug or alcohol problem be removed from their files.

### Discussion

On a motion for a preliminary injunction, the movant must show a reasonable probability of success on the merits of the litigation and the probability of irreparable harm if preliminary relief is not granted. *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir.1975).[4] Since a preliminary injunction is extraordinary relief, the movant's burden is not light. *Frank's GMC Trucking Center, Inc. v. General Motors Corp.,* 847 F.2d

2. For a description of the EMIT test and the gas chromatography/mass spectrometry ("GC/MS") tests, see Kaufman, Testing for Drugs of Abuse: Methods and Reliability, 2 J. of Law and Health 1 (1987–88). The same two testing methods appear in most of the cases we have surveyed.

3. Some of the evidence suggests that only the urine is tested, and the blood is kept only to confirm positive results and to determine levels of the substance in the bloodstream. *See* Defendant's Exhibit A. However, the witnesses indicated that all tests are performed on both the blood and urine; therefore, we will assume this to be the fact. *See* Testimony of Dr. Bush.

4. The Union clearly has standing to bring this action on behalf of its members. *See National Treasury Employees Union v. Von Raab,* 649 F.Supp. 380, 383, 384 (E.D.La.1986), *vacated on other grounds,* 816 F.2d 170 (5th Cir.1987).

100, 101 (3d Cir.1988). In addition, the court must consider "the possibility of harm to other interested persons from the grant or denial of the injunction, and ... the public interest." *Oburn*, 521 F.2d at 147.

We do not find it reasonably probable that defendant's testing during its annual physical examinations violates the Fourth Amendment; therefore, we will deny plaintiff's motion for a preliminary injunction.

■ Urinalysis and the drawing and analysis of blood are searches. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175–76 (5th Cir.1987). They compromise legitimate expectations of privacy in two distinct ways. The taking of the bodily fluid intrudes physically upon the integrity of one's body and its functions. *Von Raab*, 816 F.2d at 175; Miller, Mandatory Urinalysis Testing and the Privacy Rights of Subject Employees: Toward a General Rule of Legality Under the Fourth Amendment, 48 U.Pitt.L.Rev. 201, 207–208 (1986). Although it is a waste product, urine is discharged privately. A reasonable person would not expect "animals, children, snoops, and other members of the public" to rummage through one's urine, unlike garbage left at the curb. *See California v. Greenwood*, — U.S. —, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988); *Patchogue–Medford Congress of Teachers v. Board of Education*, 70 N.Y.2d 57, 517 N.Y.S.2d 456, 460, 510 N.E.2d 325, 328 (1987). Second, analysis of blood and urine exposes to the government and public private facts about one's life. *See Capua v. City of Plainfield*, 643 F.Supp. 1507, 1513–1514 (D.N.J.1986); Miller, *supra*, 48 U.Pitt. L.Rev. at 207–208.

■ The Fourth Amendment proscribes unreasonable searches and seizures. Drug testing of government employees for non-criminal purposes need not be based upon a warrant or probable cause. *Amalgamated Transit Union, Local 1277 v. Sunline Transit Agency*, 663 F.Supp. 1560, 1567–68 (C.D.Cal.1987); *see O'Connor v. Ortega*, 480 U.S. 709, —–—, 107 S.Ct. 1492, 1499–1503, 94 L.Ed.2d 714, 724–728 (1987). To determine more exactly the appropriate standard of reasonableness for the context before us, we must balance

the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.... In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control and the efficient operation of the workplace.

*O'Connor*, 480 U.S. at —, 107 S.Ct. at 1499, 94 L.Ed.2d at 724. Using this balance, we hold that the Fourth Amendment does not require individualized reasonable suspicion for drug testing of transportation workers as part of a bona fide annual physical examination. We hold that conducting such tests pursuant to a uniform, non-discretionary policy satisfies the Fourth Amendment's purpose of "safeguard[ing] the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967).

Two recent opinions have discussed drug testing as part of an annual physical. In *Jones v. McKenzie*, 628 F.Supp. 1500 (D.D. C.1986), *rev'd in part*, 833 F.2d 335 (D.C. Cir.1987), after a significant increase in traffic accidents and absenteeism, and the discovery of syringes and needles in the employee restroom, defendant instituted urinalysis for drugs as part of the annual physical examination. Plaintiff, a school bus attendant, tested positive for THC, the active chemical in marijuana, in an unconfirmed EMIT test. School bus attendants were responsible for helping handicapped children on and off the bus and for maintaining order during bus trips. Despite negative results on two follow-up urinalyses, plaintiff's excellent employment record, and her uncontested denial of drug or marijuana use, defendant terminated her. 628 F.Supp. at 1503, 1507.

The district court held that the termination violated due process and that the urinalysis violated the Fourth Amendment. In a brief analysis, the court found that the safety concerns of plaintiff's job were not weighty enough to justify a search without probable cause. 628 F.Supp. at 1508–09. The court recognized, however, that bus drivers and mechanics would present greater safety concerns than attendants. *Id.*

The defendant appealed only that part of the district court's order which enjoined testing of plaintiff absent probable cause. The court of appeals gave greater weight to the safety ramifications of plaintiff's job responsibilities, although it did find that "the safety concern may be somewhat greater" for drivers. 833 F.2d at 340. Relying on this, and on the evidence of serious drug problems in the workforce, the court held that testing as part of a "routine, reasonably required, annual medical examination" absent any individualized suspicion was constitutional, if the testing method would reveal the use of drugs or impairment by drugs while on duty. Since the defendant conceded that the EMIT test could not determine the time of use or degree of impairment, *id.* at 341; *see* 628 F.Supp. at 1505 n. 2, a search by that testing method would not be reasonably related to the search's justification and, hence, would be unconstitutional. 833 F.2d at 340–41. The court ruled, however, that the defendant could test with methods that would reveal on duty use or impairment. *Id.* at 341.

In *Wrightsell v. City of Chicago*, 678 F.Supp. 727 (N.D.Ill.1988), the Court held that "[d]rug testing [of police officers] 'as a part of a routine, reasonably required, employment-related medical examination' is permissible, even absent reasonable suspicion of drug use, 'where there is a clear nexus between the test and the employer's legitimate safety concern.'" 678 F.Supp. at 733 (*quoting McKenzie*, 833 F.2d at 336). Although the court purported to rely on *McKenzie*, its opinion was much broader.

Unlike the workforce in *McKenzie*, the Chicago Police Department did not show signs of a drug problem. Further, the *Wrightsell* court did not scrutinize the testing method at issue to discern whether it revealed on duty use and impairment as opposed to off duty use. Instead, the court simply noted that the tests and medical examinations were designed to ensure the fitness of the police officers to perform their jobs and that the City had a legitimate interest in the officers' fitness. 678 F.Supp. at 733. For the *Wrightsell* court, this was a sufficient nexus.

The court also emphasized that drug testing as part of a routine medical examination inflicts a minimal intrusion on privacy interests. "Giving a urine sample is part of an ordinary physical examination and, whatever interest in 'physiological secrets' in already-discharged urine there may be, *see Von Raab*, 816 F.2d at 175–76; *Feliciano [v. City of Cleveland]*, 661 F.Supp. [578] at 584 [ (N.D.Ohio 1987) ], testing for the presence of certain drugs is a minimal intrusion." 678 F.Supp. at 734. *See also McDonnell v. Hunter*, 612 F.Supp. 1122, 1127 (S.D.Iowa 1985) ("One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds, except as part of a medical examination."), *aff'd as modified*, 809 F.2d 1302 (8th Cir.1987). Moreover, unlike random tests, the medical examinations were conducted only under specified circumstances of which the officers had notice, thereby reducing the likelihood of abuse or harassment. 678 F.Supp. at 733. *See also Harris v. Washington*, No. 84 C 8812 slip op. (N.D.Ill. Feb. 6, 1985) [available on WESTLAW, 1985 WL 17506] (unpublished opinion upholding drug testing of police officers as part of routine return-to-work physicals; described in depth by its author, Judge Getzendanner, in *Taylor v. O'Grady*, 669 F.Supp. 1422, 1440–41 (N.D.Ill. 1987)).[5]

---

5. In *Policemen's Benevolent Association of New Jersey, Local 318 v. Township of Washington*, 672 F.Supp. 779 (D.N.J.1987), *rev'd*, 850 F.2d 133 (3d Cir.1988), the district court enjoined drug testing during annual medical examinations on the grounds that the examinations were

Obviously, neither *Jones* nor *Wrightsell* binds us. Although both upheld testing as part of routine physicals, they are in some conflict. *Wrightsell* speaks broadly and indicates that all testing as part of a physical passes constitutional muster. *Jones* approves only testing which will indicate use or impairment on the job. Since the parties in this case agree that the testing program before us can not specify the time of use or degree, if any, of impairment, this testing probably would be unconstitutional under the reasoning of *Jones.* Therefore, we perform our own balancing of governmental and individual interests. *See O'Connor,* 480 U.S. ——, 107 S.Ct. at 1499, 94 L.Ed.2d at 724.

We find that testing as part of a regular medical examination works a minimal intrusion on the plaintiffs' Fourth Amendment privacy interests. Since providing blood and urine samples has been part of the employees' medical examinations for at least twelve years, drug and alcohol testing does not affront any reasonable expectation in bodily integrity. *See* Miller, *supra,* 48 U.Pitt.L.Rev. at 237. Further, in earlier years, the Authority collected these samples to learn physiological secrets about the employees' health. Drug and alcohol testing merely extracts some additional, limited information from the sample: whether any of ten substances is present in the body. *See Wrightsell,* 678 F.Supp. at 734.

Unlike random and surprise drug testing, a routine medical examination takes place in a manner likely to allay anxieties. The employee has notice far in advance; the physical is always scheduled for his anniversary month. *See Von Raab,* 816 F.2d at 177; *Wrightsell,* 678 F.Supp. at 733; *American Federation of Government Employees v. Dole,* 670 F.Supp. 445, 447–448 (D.D.C.1987). The Authority does not single any one out for an examination. Since everyone must submit to an examination, the worker should not suffer any stig-

ma or shock. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 558–60, 96 S.Ct. 3074, 3083–84, 49 L.Ed.2d 1116 (1976); *Dole,* 670 F.Supp. at 448.

Finally, we must remember that these tests are for an administrative, not a criminal purpose. "While the fourth amendment protects against invasions for civil as well as criminal investigatory purposes, the need for protection against governmental intrusion diminishes if the investigation is neither designed to enforce criminal laws nor likely to be used to bring criminal charges against the person investigated." *Von Raab,* 816 F.2d at 179. The Authority does not report positive results for illegal substances to law enforcement officials.

"The governmental interest justifying work-related intrusions by public employers is the efficient and proper operation of the workplace." *O'Connor,* 480 U.S. at ——, 107 S.Ct. at 1501, 94 L.Ed.2d at 727. Where, as here, the public's lives depend on the reliable and sober performance of government employees, the government's interest in closely supervising its employees is at its zenith. *See* Miller, *supra,* 48 U.Pitt.L.Rev. at 237–38. Bus drivers and mechanics bear direct and daily responsibility for more lives than any other type of public employee. *See Jones,* 833 F.2d at 340; *Transportation Workers' Union of Philadelphia, Local 234 v. Southeastern Transportation Authority,* ("SEPTA"), 678 F.Supp. 543, 549 (E.D.Pa.1988). Each Cambria County bus carries up to seventy passengers through crowded areas. An impaired driver or mechanic could injure or kill scores of people.

Unlike the situation in SEPTA, there has not been a history of serious accidents or incidents of drivers and mechanics working under the influence of drug and alcohol in Cambria County. If we can draw any conclusions from the five incidents over the past seven years cited by the Authority, it would be that drug and alcohol problems

not part of a "bona fide medical fitness plan" but were a "pretextual sham" concocted to accomplish mandatory drug testing. 672 F.Supp. at 794–95. The court of appeals reversed without addressing this reasoning; instead, the appellate court found that the police were a highly

regulated industry and upheld the testing under the administrative search rationale. 850 F.2d 133. Neither opinion sheds light on the issue before us: testing as part of a bona fide annual medical examination.

are less serious and less frequent among Cambria County drivers and mechanics than among the population at large. *Cf. Taylor,* 669 F.Supp. at 1426–29 (ten percent of the workforce has a substance abuse problem). Moreover, the Authority produced no evidence of public suspicion about the sobriety of the drivers and mechanics.

Nonetheless, the Authority need not await the development of a problem. It may take preventative measures. *Von Raab,* 816 F.2d at 179. The testing at issue here, like any physical examination, is designed to detect a problem before it impairs the employee's functioning.

For this reason, testing upon reasonable suspicion is inadequate. Reasonable suspicion testing allows inquiry only after a problem manifests itself at work. In general, and especially on the facts of this case, reasonable suspicion testing will not catch many employees who are impaired on the job. We find that workers with a substance abuse problem can conceal their condition from most observers, even the highly trained. *See* McBay Depo. 45–47; Control of Alcohol and Drug Use in Railroad Operations; Final Rules and Miscellaneous Amendments, 50 Fed.Reg. 31508, 31526–27 (1985). In Cambria County, supervisors do not see most drivers but for the ten minutes at the beginning or end of the day when the drivers take and return their busses from the garage. Drivers work alone. Those drivers who take over a bus on its route and turn it over to the next driver also on the route can work totally unobserved.

Balancing the individual's and the government's interests, we hold that individualized reasonable suspicion is not necessary for the type of search before us. *See United States v. Martinez–Fuerte,* 428 U.S. at 556–562, 96 S.Ct. at 3082–85; *but see Railway Labor Executives' Association v. Burnley,* 839 F.2d 575 (9th Cir. 1988), *cert. granted,* —— U.S. ——, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988). In *Martinez–Fuerte,* the Supreme Court upheld blanket stops and inspection of cars for illegal aliens at fixed checkpoints without any individualized suspicions. The Court considered the intrusion minimal because of the brevity of the stops, their uniformity and the concomitant unlikelihood of distress to drivers, the diminished privacy expectation in cars, and the absence of any opportunity for discretionary enforcement. The Court rejected a requirement of individualized reasonable suspicion as impractical and unlikely to deter smugglers of aliens. 428 U.S. at 557, 96 S.Ct. at 3082.

In *Burnley,* the Ninth Circuit Court of Appeals struck down as violative of the Fourth Amendment post-accident testing of railway workers without individualized reasonable suspicion that the workers had used drugs. Courts may dispense with a requirement of individualized suspicion " 'only where privacy interests implicated by a search are minimal.' " *Burnley,* 839 F.2d at 588 (*quoting New Jersey v. T.L.O.,* 469 U.S. 325, 342 n. 8, 105 S.Ct. 733, 743 n. 8, 83 L.Ed.2d 720 (1985)). To the *Burnley* court, urinalysis was a more than minimal intrusion. The court reasoned that while searches of property may be conducted without particularized suspicion in certain contexts, searches of the person, because they are more intrusive, may not. 839 F.2d at 587–88. Further, the court believed that reasonable suspicion testing could satisfy the governmental interest in safety. *Id.* at 588.

To the extent *Burnley* draws a sharp line between searches of the body and all others, we must disagree. In *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir.1986), our court of appeals rejected a requirement of individualized reasonable suspicion for urinalysis of jockeys. The court found that horse-racing was a highly-regulated industry and that the administrative search rule permitted random urinalysis of jockeys. *See also Policeman's Benevolent Association of New Jersey, Local 318 v. Township of Washington ("PBA"),* 850 F.2d 133 (3d Cir.1988) (holding that random urinalysis is constitutional within the highly regulated police industry). While the Authority has not argued that public transportation is a highly regulated industry, *Shoemaker* and *PBA* indicate that when the intrusion is minimal and the governmental interest great, individualized reasonable suspicion is

not a prerequisite to a constitutional search. *See Shoemaker,* 795 F.2d at 1142–43; *PBA,* at 135–36.

Regardless of the merits of *Burnley* on its facts, we find the type of search before us to be minimally intrusive. Given the strong governmental interest and the ineffectiveness of a reasonable suspicion standard in this case, we hold that individualized reasonable suspicion is unnecessary and that the tests before us need only be conducted pursuant to a uniform policy that prevents the arbitrary exercise of official discretion. *See Shoemaker,* 795 F.2d at 1143; *SEPTA,* 678 F.Supp. at 551.

The Authority's policy is uniform and non-discretionary. Every employee must submit to an examination and testing at the same time, the anniversary of his starting-date. There is no room for official discretion either in the selection of employees to be tested or the scheduling of the test.

■ Our analysis does not end here. Our balancing of public and private interests establishes the applicable standard of reasonableness. We have concluded that a standard requiring this type of search to be non-discretionary and to be carried out pursuant to a uniform policy is appropriate. *See United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074; *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (inventory searches). Now, we must examine the particular search involved in this case to determine whether, tested by the standard we have deemed appropriate, it was justified at its inception and " 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *New Jersey v. T.L.O.,* 469 U.S. 325, 341, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985) (*quoting Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).

Since the standard applicable to this case does not require suspicion directed at a particular person and since only the testing program, not any particular instance of testing, is before us, examination of the justification at the inception of a particular search has little role in this case. The governmental interests that justify dispensing with reasonable suspicion likewise justify the Authority's program of uniform, non-discretionary testing. If in a particular instance, a test is pretextual or deviates from the Authority's uniform policy, the individual to be tested may challenge the test on that ground. *See Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083; *Bertine,* 479 U.S. at 374 n. 6, 375, 107 S.Ct. at 742 n. 6, 743, 93 L.Ed.2d at 747 n. 6, 748.

The inquiry into the reasonableness of the relationship between the testing method and the interests it is to serve requires an examination of the method's effectiveness. The search must be "a 'sufficiently productive mechanism' for achieving its purpose, for no privacy invasions should be permitted unless some good end is served." *Von Raab,* 816 F.2d at 180 (*quoting Delaware v. Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399).

The relationship between the testing method at issue here and the prevention of on the job impairment is questionable in several respects. First, since neither the EMIT nor the GC/MS test detects the amount of a substance in the employee's body, the testing does not indicate whether the subject was impaired at any time. *See Burnley,* 839 F.2d at 587. Second, since many of these substances may remain in a person's blood and urine in detectable amounts for periods of time ranging from several hours for alcohol to several weeks for marijuana, testing will not determine time of use and whether it occurred on or off the job. *See McBay Depo.* 29–32, 49–50. Third, from a positive result, one may conclude only that on some unspecified occasion the subject ingested this substance. This does not indicate that the worker is likely to show up for work impaired or use drugs or alcohol on the job. *See Taylor,* 669 F.Supp. at 1437. Fourth, the advance notice a worker has of when his physical will take place enables him to abstain and cleanse his system before his test. Thus, the test is unlikely to detect any users. In fact, it may encourage in management a false sense of security. *See Von Raab,* 816 F.2d at 184 (Hill, J. dissenting).

Although these objections all have some validity, we conclude that the Authority's drug testing program will serve the laudable goal of fostering a drug-free and sober workforce. That an individual has used drugs or alcohol on some occasion does not compel the conclusion that he will use drugs or alcohol on the job or will show up for work impaired, but, generally, those who have used these substances once are more likely to use them again than those who have never used them. *See Borsari v. Federal Aviation Administration,* 699 F.2d 106, 111 (2d Cir.1983) (upholding a civil servant's termination for off-duty possession of marijuana and cocaine as promoting the efficiency of the service); *McDonnell v. Hunter,* 809 F.2d 1302, 1308 (8th Cir.1987) (correctional officers who use drugs are more likely to supply them to inmates). The Authority has a right to determine which workers pose a potential problem and to take steps to prevent that potential from erupting into a tragedy.

Further, the advance notice accompanying this testing makes it more likely that a positive test result indicates a serious problem. Most occasional users will abstain and cleanse their systems before their test. Those who do not, despite the great advance notice they have, are more likely to be chronic users and addicts, unable to abstain from drinking or drug use for any substantial length of time. *Von Raab,* 816 F.2d at 180; *see* McBay Depo. 80–81. Chronic users and addicts probably will use drugs or alcohol on the job at some point. *See Taylor,* 669 F.Supp. at 1437–38.

Despite the advance notice, this testing may deter workers from using drugs. The time it takes a drug to leave the body may vary considerably; workers may decide to abstain entirely rather than run the risk that their last uses were remote enough to leave no trace. *See Von Raab,* 816 F.2d at 180. This deterrent effect will help to achieve the Authority's legitimate goal of keeping its workforce drug-free.

We do not believe that these tests will foster a false sense of security in management. The Authority's executive director was aware that the medical examinations probably would detect only chronic users; at this point, that is the Authority's objective. We are impressed with the reasonableness of the Authority's position and the concern its policy shows for its employees' rights and welfare. Right now, the Authority does not face a serious substance abuse problem; consequently, it has restricted its testing program to relatively unobtrusive measures designed to prevent the emergence of a problem. The program's goals are modest, though important, and reasonable in light of the situation. We hardly think that the Union ought to complain that the Authority has not adopted more effective and more intrusive measures, such as random testing or the daily testing suggested by plaintiffs' expert, Dr. McBay. *See* McBay Depo. 49–50.

Finally, the union asserts, through the testimony of Dr. McBay, that marijuana and cocaine do not impair performance. Since marijuana remains in the body in detectable traces longer than any other substance for which the Authority tests, it is most likely to cause a positive result despite an employee's efforts to abstain. Thus, plaintiffs argue, the Authority's policy is directed primarily at substances which do not impair performance and these searches bear no relationship to the legitimate purpose of guaranteeing a clear-minded workforce.

We find Dr. McBay's testimony on the effects of cocaine and marijuana unconvincing, and we reject it. We find more persuasive the conclusion expressed in defendant's deposition exhibit 2: that exhibit reports that a study of pilots found that twenty-four hours after smoking marijuana, the pilots showed serious impairment on flight simulation tests. Yesavage, Leirer, Denari, and Hallister, Carry–Over Effects of Marijuana Intoxication on Aircraft Pilot Performance: A Preliminary Report, 142 Am.J. Psychiatry 1325 (1985). Dr. McBay's opinion is also contrary to the conclusion of the Federal Railroad Administration, after public hearing and comment, that marijuana played a causal role in several serious railroad accidents. *See* 50 Fed. Reg. 31508, 31515–25.

*Conclusion*

We conclude that there is no reasonable probability that the Authority's drug and alcohol testing program violates the Fourth Amendment. The Authority need not have individualized reasonable suspicion to test its bus drivers and mechanics for drugs and alcohol during their routine annual medical examinations. For this type of search, the Fourth Amendment requires only that the tests take place pursuant to a uniform, non-discretionary policy, and they do. This testing program bears a reasonable relationship to the Authority's legitimate goal or insuring employee and public safety by fostering a work environment free of the effects of alcohol and controlled substances. We will deny plaintiffs' motion for a preliminary injunction.

An appropriate order will follow.

### ORDER OF COURT

AND NOW, this 19th day of July, 1988, IT IS ORDERED that plaintiffs' motion for a preliminary injunction is denied for the reasons stated in this court's memorandum opinion of this day; and,

IT IS FURTHER ORDERED that within twenty (20) days of this order the plaintiffs file with the court a statement of whether they intend to pursue this action any further; and, if they do, a statement of the issues that remain to be tried. If plaintiffs fail to file this statement as ordered, the court will assume that the memorandum opinion and order of today dispose of plaintiffs' claim, and the court will enter judgment for the defendant.