895 A.2d 472

NEW JERSEY TRANSIT PBA LOCAL 304, PLAINTIFF–APPEL-
LANT, v. NEW JERSEY TRANSIT CORPORATION, AND CHIEF
JOSEPH C. BOBER, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 12, 2005—Decided April 12, 2006.

514

Before Judges A.A. RODRÍGUEZ, ALLEY and YANNOTTI.

*Michael A. Bukosky* argued the cause for appellant (*Loccke & Correia*, attorneys; *Mr. Bukosky*, on the brief).

*Richard W. Schleifer*, Deputy Attorney General, argued the cause for respondents (*Peter C. Harvey*, Attorney General, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel; *Mr. Schleifer and Sharon Price–Cates*, Deputy Attorney General, on the brief).

*Colin Lynch* argued the cause for amicus curiae New Jersey State Policemen's Benevolent Association (*Zazzali, Fagella, Nowak, Kleinbaum & Friedman,* attorneys; *Paul L. Kleinbaum,* of counsel and on the brief; *Joshua I. Savitz,* on the brief).

The opinion of court was delivered by

RODRÍGUEZ, A.A., P.J.A.D.

In this appeal, we hold that an annual medical examination program adopted by a law enforcement public employer for its police officer employees, which requires disclosure of medical history as well as blood and urine testing, does not violate Article 1, paragraph 7 of the New Jersey Constitution, or the Fourth Amendment to the United States Constitution. Such a uniform, non-discretionary program is less intrusive on the officer's legitimate expectation of privacy than the random drug and alcohol testing permitted by the Supreme Court in *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp.,* 151 *N.J.* 531, 701 *A.*2d 1243 (1997), a case involving the same parties.

I

New Jersey Transit PBA Local No. 304(PBA), the collective bargaining representative and negotiating agent for police officers employed by the New Jersey Transit Corporation (NJT), appeals from the May 7, 2004 summary judgment dismissing its verified complaint against NJT.[1] The objective of PBA's lawsuit was to enjoin NJT's Police Chief, Joseph C. Bober, from "continuing to implement and enforce a medical examination program," which was compulsory for all NJT police officers. We affirm.

These are the salient facts. On January 16, 2003, Chief Bober issued Administrative Order No. A–03–005, which requires all NJT police personnel to submit to annual medical examinations

---

[1] PBA's Notice of Appeal erroneously indicated that it is appealing from a July 17, 2003 order.

during their birth date month. The annual medical examination was recommended by NJT's Director of Medical Services, Elizabeth Schneider, RN, MPS, MS. The purpose of the examination is to determine whether or not an officer is physically capable of performing his or her duties. According to Schneider, the examination "represents a basic physical as recommended by the American Medical Association." It consists of the following components:

1. Medical History
2. Complete Laboratory Work which includes: (Complete Blood Count with Differential; Super Smac which consists of Liver Function, Cardiac Profile and Electrolytes, PSA—age appropriate)
3. Clinitex 10 urine drip stick
4. Pulmonary Function
5. Electrocardiogram
6. Drug and Alcohol Testing (non-DOT)
7. Mantoux
8. Physician Examination
9. Vision and Hearing Screens
10. Lead Testing

Part of the blood analysis is the "Blood Borne Pathogen Program." If a police officer refuses to submit to the exam, the officer may be disciplined with sanctions that include suspension or termination.

Upon completion of the examination, form MD–40, which contains no medical information, but does contain the examiner's conclusion on whether the officer is medically qualified to perform his/her duties as a police officer, is forwarded to the officer's commanding officer. The commanding officer then forwards form MD–40 to NJT's Records Section. All other medical information and testing results are maintained by NJT's Medical Services. The results of the testing is shared only with the officer. The policy of NJT is to maintain these medical records confidentially in accordance with Corporate Policy 3.22, which states that "all services received and records of service are confidential and shall be released only on a need to know basis." This policy complies with state and federal regulations, including the Health Insurance Portability and Accountability Act (HIPPA), 42 *U.S.C.A.* § 1320,

which concerns the protection of personal medical information and regulates its use and disclosure. *Community Hospital Group, Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte, P.C.,* 381 *N.J.Super.* 119, 125, 885 *A.*2d 18 (App.Div.2005).

Upon receiving Administrative Order A–03–005, the PBA objected to three aspects of the medical examination, specifically the medical history, Blood Borne Pathogen Program and the urine analysis, and requested that NJT desist from implementing the examination program. Then, PBA filed a complaint alleging that the examination contravenes the United States and New Jersey Constitutions. The PBA sought an injunction, a declaration that the program is void and compensatory damages. Following a hearing, the Chancery Division, Bergen County, denied the injunction. We denied leave to appeal. No. M–6237–02 (App.Div. August 27, 2003).

The matter was tried summarily on stipulated facts. Judge Gerald C. Escala found for NJT and dismissed the complaint. Judge Escala concluded that "the invasion of the officers' legitimate expectations of privacy is outweighed by [NJT's] need to supervise and control the operation of the police officers." Relying on *Rawlings v. Police Dept. of Jersey City,* 133 *N.J.* 182, 188–90, 627 *A.*2d 602 (1993), the judge concluded that in balancing the interests of PBA members in being free from testing against the NJT's interest in determining an officer's continued fitness to perform his or her duties, the latter is paramount. The judge noted, however, that:

[NJT] must implement security provisions coupled with an express ... policy prohibiting unauthorized disclosure of confidential medical information. The 'need to know' standard in place now is inadequate to protect [the PBA members'] privacy interest. [NJT] must articulate what constitutes a 'need to know.' Specifically, a who, what, where, when, why and how standard for disclosure must be established by [NJT].

## II

On appeal, PBA contends that the judge erred by: (1) construing this matter as a drug testing case and by failing to apply the

"special needs" balancing test; (2) finding that NJT has a special need to "supervise and control the operation of police officers;" (3) confusing random drug testing with forced blood and urine analysis for all other purposes; and (4) failing to enjoin medical tests which do not have adequate confidentiality safeguards. PBA also contends that the requirement that an officer submit to the "Blood Borne Pathogen Program" impinges upon the constitutional right to bodily integrity, privacy and liberty interests to be free from non-consensual bodily examinations. Amicus curiae New Jersey State Policemen's Benevolent Association (State–PBA) has filed a brief urging reversal.[2] State–PBA argues that the judge failed to properly analyze an officer's constitutional privacy right. We are not persuaded by these contentions.

On the merits, the PBA argues that the judge misunderstood this case to be a drug testing case. The PBA stresses the point that it "does not contest random drug and alcohol testing," because "such testing has been consistently upheld by the courts." We agree with this statement. The leading case is *New Jersey Transit PBA Local 304 v. New Jersey Transit Corp., supra,* 151 *N.J.* 531, 701 *A.*2d 1243. What the PBA contests here is, "blood and urine testing for any other privacy invading purpose." PBA maintains that, "[i]f [NJT] simply limited the scope of its blood and urine tests to seek[ ] out abusers of alcohol or drugs, the PBA would have little cause for complaint."

Despite this declaration, we note that the PBA frames its analysis of the issues in this case in terms appropriate for testing the legality of a random urine and alcohol test, rather than a bona fide, annual physical examination conducted pursuant to a uniform, non-discretionary policy by a public employer in a well-regulated industry. That is the proper analysis.

---

[2] We granted State–PBA's motion to file a brief and participate in oral argument. No. M–1592–04 (App.Div. December 14, 2004).

■ We have ruled, in the scope-of-negotiations context, that medical examinations, such as the one here, are a managerial prerogative in public sector employment. *Township of Bridgewater v. PBA Local 174,* 196 *N.J.Super.* 258, 482 *A.*2d 183 (App.Div. 1984). Physical fitness tests bear on a police officer's ability to do his or her job. *Id.* at 261, 482 *A.*2d 183 (citing *State v. State Supervisory Employees Ass'n.,* 78 *N.J.* 54, 90–92, 393 *A.*2d 233 (1978)). The medical examination criteria must be directly related to the public employer's right to establish physical fitness performance requirements. *Bridgewater, supra,* 196 *N.J.Super.* at 262, 482 *A.*2d 183. The public employer has the right to determine the qualifications necessary for its police officers to perform their duties and to determine whether an officer meets those qualifications. *Ibid.*

■ There is no dispute that a physical examination constitutes a search. *See Schmerber v. State of California,* 384 *U.S.* 757, 766–770, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908, 917 (1966); *see also State v. Hand,* 101 *N.J.Super.* 43, 60, 242 *A.*2d 888 (Law Div.1968) (holding that a physical examination of a person by a doctor constitutes a search within the meaning of the Fourth Amendment). Therefore, this managerial prerogative still must meet the constitutional requirement that an individual be free from unreasonable governmental searches as guaranteed by Article I, paragraph 7 of the New Jersey Constitution and the Fourth Amendment to the United States Constitution. The NJT examination meets these requirements. We have held that the Fourth Amendment does not require individualized reasonable suspicion for drug testing of transportation workers as part of a bona fide annual physical examination. *Int'l Fed'n of Prof'l & Technical Engineers, Local 194A v. Burlington County Bridge Comm'n.,* 240 *N.J.Super.* 9, 11, 572 *A.*2d 204 (App.Div.), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990). *See Amalgamated Tr. Union v. Cambria Cty. Tr. Auth.,* 691 *F.Supp.* 898, 902–04 (W.D.Pa.1988) (emphasizing a public employer's need for supervision and control of the workplace in contrast to the employee's expectation of privacy); *Jones v.*

*McKenzie,* 833 *F.*2d 335, 340 (D.C.Cir.1987) (upholding drug test-
ing as part of a routine medical examination for teachers, citing a
clear nexus between such tests and the employer's legitimate
safety concern for the well being of school children) *amended by*
878 *F.*2d 1476 (D.C.Cir.1989).

A balancing test used to evaluate searches conducted by a public
employer was described by the Supreme Court in *O'Connor v.
Ortega,* 480 *U.S.* 709, 719, 107 *S.Ct.* 1492, 1499, 94 *L.Ed.*2d 714, 724
(1987). There, the Court said:

> [i]n the case of searches conducted by a public employer, we must balance the
> invasion of the employees' legitimate expectations of privacy against the govern-
> ment's need for supervision, control and the efficient operation of the workplace.
>
> [*Ibid.*]

Furthermore, the Fourth Amendment does not require individu-
alized reasonable suspicion for conducting the NJT medical exami-
nation program. A federal court has held that conducting such
tests pursuant to a uniform, non-discretionary policy satisfies the
Fourth Amendment's purpose of "safe-guarding the privacy and
security of individuals against arbitrary invasions by governmental
officials." *Amalgamated, supra,* 691 *F.Supp.* at 902. *See also
Policemen's Benevolent Ass'n of N.J. Local 318 v. Washington
Twp.,* 850 *F.*2d 133 (3d Cir.1988), *cert. denied,* 490 *U.S.* 1004, 109
*S.Ct.* 1637, 104 *L.Ed.*2d 153 (1989).

Here, the privacy interest of the police officer is not as signifi-
cant as the government's interest present in the random drug or
alcohol testing. In the latter instance, the officer faces disciplin-
ary, perhaps criminal sanctions. Here, the consequence is a
determination of fitness to perform the functions of the position.
Although we are mindful that an adverse determination may
result in termination, no officer has the right to hide his or her
lack of fitness by asserting a privacy interest as a barrier to a
physical examination. More importantly, no officer who is unfit
for the position has the right to remain in the position.

## III

Moreover, the examination program ordered by NJT passes constitutional muster pursuant to a recognized exception to the warrant requirement: administrative searches of pervasively regulated industries pursuant to a substantial government interest. The Supreme Court explained, "[t]he pervasively regulated industry exception to the warrant requirement has generally been applied to businesses that have a 'long tradition of close government supervision.' " *N.J. Transit, supra,* 151 *N.J.* at 545, 701 *A.*2d 1243 (quoting *Marshall v. Barlow's Inc.,* 436 *U.S.* 307, 313, 98 *S.Ct.* 1816, 1821, 56 *L.Ed.*2d 305, 312 (1978)). The Court noted that both New Jersey and federal courts have found that people who work in industries "subject to close supervision and inspection," have a diminished expectation of privacy. *Ibid.* Thus, warrantless searches conducted in a pervasively regulated industry are:

> deemed to be reasonable only so long as three criteria are met. First there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made ... Second, the warrantless inspections must be "necessary to further [the] regulatory scheme."

> [And], finally, "the statute's inspection program, in terms of the certainty and regularity of its application [must] provid[e] a constitutionally adequate substitute for a warrant."

> [*Id.* at 546, 701 *A.*2d 1243 (quoting *New York v. Burger,* 482 *U.S.* 691, 702–03, 107 *S.Ct.* 2636, 2644, 96 *L.Ed.*2d 601, 614 (1987) (citations omitted)) ].

Police officers are members of a highly regulated industry and are therefore subject to the practice of suspicionless drug testing to monitor their physical fitness and capabilities. *Policemen's Benevolent Ass'n, supra,* 850 *F.*2d at 136–141.

As stated above, the Supreme Court has held that random drug testing of NJT's police force is not unreasonable pursuant to the New Jersey Constitution, in light of the officers' decreased expectation of privacy, adequate limitations on the obtrusiveness of the testing, and the compelling state interest in promoting safe conduct by armed officers. *N.J. Transit, supra,* 151 *N.J.* at 557–58, 701 *A.*2d 1243.

522

The United States Supreme Court has sustained drug testing if there is a special governmental need that would be jeopardized by adherence to the individualized suspicion standard. *Skinner v. Railway Labor Executives' Ass'n*, 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989), *Nat'l Treasury Employees Union v. Von Raab*, 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (1989). In *N.J. Transit,* our Supreme Court explained that, pursuant to the *Skinner/Von Raab* line of cases, a suspicionless search may be permissible when the search serves "special needs, beyond the normal need for law enforcement." *N.J. Transit, supra,* 151 *N.J.* at 548, 701 *A.*2d 1243 (quoting *Chandler v. Miller,* 520 *U.S.* 305, 117 *S.Ct.* 1295, 1301, 137 *L.Ed.*2d 513, 523 (1997)).

Applying that analysis here, it is clear that the mandatory annual physical examinations at issue, including the request for medical history and the testing of blood and urine, do not violate the New Jersey or United States Constitutions. First, the same public safety justifications are present. Clearly, an officer's ability to perform his or her job safely depends on being physically capable of performing [his or her] duties. Second, a lack of physical ability to safely perform police duties can result from an ailment or condition just as easily as it can be a result of drug or alcohol use. The same reasons expressed by the Supreme Court in *N.J. Transit* apply with greater force here, where the government interest is testing an officer's fitness to meet the qualifications of the position. The intrusion on the officer's privacy is no greater than in a random drug testing case. However, the consequences to the officer do not involve disciplinary or penal sanctions.

Considering that NJT has a substantial interest in protecting its employees and the public, there is a substantial government interest, akin to the drug testing in *N.J. Transit,* and therefore justifies the minimal privacy intrusions present here. *See also Int'l Fed'n of Prof'l & Technical Engineers, Local 194A v. Burlington County, supra,* 240 *N.J.Super.* at 24–25, 572 *A.*2d 204 (applying the special needs test in upholding urine testing for

drugs of bridge workers at their annual physical examinations). As for blood testing, the Supreme Court explained in *Skinner* that this type of testing is now "commonplace." PBA cites case law for the proposition that medical history and records are a private matter and employers may not disclose that information to a third party. However, an employer's disclosure of that information is an entirely separate issue from requesting an employee's medical history.

Our holding is consistent with federal cases. *See Policemen's Benevolent Ass'n, supra,* 850 *F.*2d at 136–41 (holding that a municipality's plan for mandatory random drug testing and annual medical examination programs, including urinalysis, for police officers falls within the administrative search exception to the Fourth Amendment warrant requirement because pervasive regulation of police reduced their expectation of privacy); *see also Fowler v. New York City Dep't of Sanitation,* 704 *F.Supp.* 1264, 1270 (S.D.N.Y.1989) (explaining that urine specimens as part of a physical examination to determine fitness for employment does not constitute a Fourth Amendment search, noting that the federal government requires employees in or applicants for positions with physical or medical standards to submit to physical examinations prior to appointment or selection and pointing out that courts have upheld such physicals as constitutional for both federal and state employees); *see also Amalgamated, supra,* 691 *F.Supp.* at 906 (holding that the county transit authority's drug and alcohol testing program which required taking and testing of urine and blood samples for drug and alcohol testing during each employee's required annual physical examination did not violate the Fourth Amendment as the testing program bore a reasonable relationship to authority's legitimate goal of ensuring employee and public safety by fostering a work environment free of the affects of drugs).

## IV

PBA also contends that the program lacks regulations, standards or due process procedures. The State PBA joins this

argument, indicating that the judge erred by failing to find in PBA's favor after finding that NJT's information security policy to be inadequate. We note that the judge appropriately addressed these concerns by ordering NJT to implement a policy prohibiting unauthorized disclosure of confidential medical information. We also note that NJT Corporate Policy 3.22 requires confidentiality of medical records. This Corporate Policy is consistent with the federal mandate that employees' records must be kept confidential and are reported only to the appropriate management official and the employee, except in certain limited circumstances or "as required by law." *N.J. Transit, supra,* 151 *N.J.* at 560–61, 701 *A.2d* 1243 (citing 49 *C.F.R.* § 653.75 and *Core Policy* § XIII, Addendum I § XIII).

However, the record does not disclose whether NJT has developed, as ordered by Judge Escala, "security provisions" coupled with an "express policy prohibiting unauthorized disclosure of confidential medical information." If NJT has not already done so, it must develop and implement such security provisions and express policy no later than July 1, 2006.

PBA also contends that NJT "has not implemented a single procedure or standard by which it will be governed in the practice of forcing an officer to consent to blood and urine testing as well as relinquishment of their complete medical history." Thus, PBA argues that, "the lack of procedural safeguards in this matter renders [NJT's] practice prima facie constitutionally repugnant." We reject this contention. As stated above, the medical examination is mandatory and non-discretionary. All officers must comply with it on an annual basis. Moreover, the results are kept confidential. There is no further consequence to the officer unless the medical examiner concludes that the officer is not physically fit. In that event, the existing procedures for contesting a fitness determination would be triggered. Therefore, this contention lacks merit.

We also reject PBA's argument that the medical examination is a "blanket fishing expedition for every type of private medical

condition." PBA argues that these private medical conditions can include, for example, sexually transmitted diseases, such as herpes, that have no bearing on an officer's fitness to serve. That, however, is a medical judgment that neither this court nor the PBA can make. It is up to the physician making a fitness determination to decide what impact an officer's history, or a particular test result has on the officer's fitness for duty. In light of the confidentiality of the information, we find no basis for PBA's argument that this information will be used in "screening for disabilities, pregnancy, for use in criminal investigations, paternity testing, or disciplinary reasons." The existing NJT policy, as well as New Jersey and federal law preclude such use.

Affirmed.