565 A.2d 672

**CITY OF ANNAPOLIS, et al.**

v.

**UNITED FOOD AND COMMERCIAL WORKERS, LOCAL 400, et al.**

**No. 38, Sept. Term, 1989.**

Court of Appeals of Maryland.

Nov. 9, 1989.

Jonathan A. Hodgson, City Atty. of Annapolis, for appellants/cross appellees.

William W. Thompson, II (Zwerdling, Paul, Leibig, Kahn, & Thompson, P.C., Washington, D.C., on brief), for appellees/cross appellants.

Jeffrey I. Silberman, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, and Susan Goering, Baltimore, for American Civil Liberties Union of Maryland, Inc., amicus curiae.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case involves a constitutional challenge to a mandatory, suspicionless post-employment drug testing program for police officers and fire fighters of the City of Annapolis.

## I.

For some years prior to 1986, all persons seeking employment with the City were required to take a pre-employment

physical examination, which included analysis of a urine specimen. Uniformed police and fire fighter personnel employed by the City were also required to submit to periodic post-employment physical examinations, including a urinalysis as part of the examination.

In September of 1986, the City proposed the adoption of a drug testing program requiring its uniformed police and fire fighter personnel, as a part of their regularly scheduled periodic physical examinations, to submit a urine sample to determine the presence of illegal drugs. The program's stated objectives were to provide safe, healthful and efficient working conditions for these employees and the public served by them. The frequency of the examinations of these uniformed employees was predicated upon their age. The examination was to be conducted during the "birthday" month of the police officer or fire fighter, and they were to be afforded thirty days prior notice of the week that the examination would be given. In addition, the plan required that the employee be given a forty-eight hour advance notice of the exact time of the examination.

The City presented its plan in September of 1986 to the employee organizations (the unions) representing the police officers and fire fighters under collective bargaining agreements. Disagreement arose over specific details of the City's drug testing plan as an apparent result of which, after approximately one year, no agreement had been formalized between the City and the unions.[1]

On October 21, 1987, the City filed a complaint of unfair labor practices against the unions with the Maryland Mediation and Conciliation Service (the Mediation Service), a unit functioning within the State Division of Labor and Industry under Maryland Code (1985 Repl.Vol.), Article 89, § 3. That section authorizes the Mediation Service, on behalf of the Commissioner of Labor and Industry, to investigate a

---

1. The City's "Drug Testing Policy and Procedure," as proposed to, but not accepted by the unions, is contained in an appendix to this opinion.

labor dispute which "may result in a strike or lockout" and to "seek to mediate it." The City alleged in its complaint that the unions had refused to negotiate in good faith, as required by their collective bargaining agreements. It purported to act pursuant to ch. 3.32 of the Annapolis City Code (1986), which in § 3.32.060 requires the City and recognized employee organizations "to negotiate collectively and in good faith with respect to the terms and conditions of employment of employees in the unit." Section 3.32.-070(A) prohibits, as an unfair labor practice, the refusal of a union to negotiate in good faith with the City, and § 3.32.070(B) directs that claims of unfair labor practices be filed with the Mediation Service. That section also provides that the Service "may issue an order dismissing the complaint or may order a further investigation."

The Mediation Service, after a proceeding in which the City and the unions participated, found that drug testing of the police and fire fighter personnel was a mandatory subject of collective bargaining under their agreements. It concluded that the "principle" of drug testing of these uniformed employees had been agreed upon in good faith collective bargaining between the parties but that the details of the program remained to be negotiated—that no agreement existed on the details of the plan for implementing the drug testing program with regard to obtaining, receiving and testing the urine, or procedures for rechecking positive results, or safeguards for confidentiality, or disciplinary and rehabilitative procedures. The Mediation Service noted that the employee's right to privacy with respect to the urine sample was not in question "because urine historically has been collected and routinely ... tested as part of a fire or police officer's regular physical examination." As a consequence, it said that the employee's only objection "to these examinations or the manner in which they are performed ... can be to the employer's testing of urine lawfully collected." The Mediation Service was of the view that, notwithstanding the unions' objection that suspicionless drug testing violated constitutional protections and

was therefore illegal, the City's drug testing plan "conducted within the framework of tests of urine specimens and other tests now performed during required physical examinations of police officers and fire fighters, is not unconstitutional" as an unreasonable search and seizure. It nevertheless determined, without assessing fault, that the parties were "hopelessly at impasse" and it declined to order further negotiations. Instead, it found that the City was free to unilaterally implement the details of its drug testing proposal.

The City determined to proceed with its drug testing program and so notified employees of the fire and police departments whose routine physical examinations had been scheduled. Before any examination was given, the unions sought judicial review of the decision of the Mediation Service in the Circuit Court for Anne Arundel County under the Maryland Administrative Procedure Act, Code (1984 Repl.Vol.), §§ 10–101—10–217 of the State Government Article. They claimed that the City's program was unconstitutional under both the state and federal constitutions because it did not "require reasonable suspicion as the cause for the drug test." They asked that the case be remanded to the Mediation Service with directions that the parties be required to resume negotiations to obtain a lawful drug testing program for City police and fire personnel and that, in the meantime, the City be enjoined from implementing its proposed plan. The unions also filed a verified complaint for an order directing the mediation Service to require the parties to conduct further negotiations, and to enjoin the City from implementing its mandatory, suspicionless drug testing program of police and fire fighter personnel.

The circuit court (Williams, J.) determined that the decision of the Mediation Service was not appealable under the Maryland Administrative Procedure Act because the Service was not an agency "authorized by law to adjudicate contested cases" under § 10–201(b)(1) and (2) of the Act. It concluded, however, that the alternative remedy sought by the unions to prevent implementation and enforcement of

the proposed drug testing program by the City was appropriate. It believed that the program was unconstitutional under the Fourth Amendment because it was not based on individualized suspicion of drug use among the covered employees or generalized suspicion of drug use in their respective departments. Specifically, Judge Williams framed the issue before him as "whether mandatory testing for illegal drugs as part of a police officer's cr fire fighter's routine periodic physical in the absence of individualized suspicion or any evidence whatsoever of an existing departmental problem constitutes an unreasonable search and seizure under the Fourth Amendment." After finding that mandatory urinalysis of public sector employees was a "search" under the Fourth Amendment, the court undertook to "balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control and the efficient operation of the workplace," citing *O'Connor v. Ortega,* 480 U.S. 709, 719–20, 107 S.Ct. 1492, 1499–1500, 94 L.Ed.2d 714 (1987) (plurality opinion), quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). The court adopted the statement from *Lovvorn v. City of Chattanooga, Tenn.,* 846 F.2d 1539, 1542–43 (6th Cir.) (later *vacated, reh'g granted en banc,* 861 F.2d 1388 (1988)) that

"[t]he act of urinating is one of the most private of all activities. The subjective expectation of privacy felt by many individuals when urinating is undoubtedly one that society is prepared to consider reasonable. There are few other times where individuals insist as strongly and universally that they be let alone to act in private. Furthermore, the information that may be gleaned from the analysis of an individual's urine compels the conclusion that a mandatory urinalysis, whether directly observed or not, constitutes a 'search' within the meaning of the Fourth Amendment."

Regarding the governmental interest to be protected, Judge Williams also adopted the statement in *Lovvorn* that " 'the City's interest in having its fire fighters free from drugs is

a compelling one.' " 846 F.2d at 1544. And the court recognized that the use of controlled dangerous substances by police officers and fire fighters "is especially dangerous." Nevertheless, it adopted the reasoning in *Lovvorn, id.* at 1547, that fire fighters do not hold positions whereby " 'significant losses could be imposed on society because of drug impairment' " as might be so with drug-impaired air traffic controllers or nuclear plant operators. Judge Williams agreed, therefore, with the holding in *Lovvorn* that "for a mandatory drug test of fire fighters to be reasonable, there must be some evidence of a significant department-wide problem or individualized suspicion." *Id.* Applying this test to the City's program, the court found the mandatory drug testing of City police and fire personnel unconstitutional because "there is absolutely no evidence that a drug problem exists within a governmental department or any suspicion of an individual's drug use, as the City has conceded."

The City appealed from the court's issuance of the writ of mandamus enjoining it from implementing and enforcing its suspicionless drug testing program for police and fire fighter personnel. We granted certiorari before decision by the intermediate appellate court to consider the significant issue of public importance presented by the case.

## II.

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It is applicable to the states through the Due Process Clause of the Fourteenth Amendment, *Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361–62, 93 L.Ed. 1782 (1949), and conduct by government employers is subject to its limitations. *O'Connor v. Ortega, supra,* 480 U.S. at 715, 107 S.Ct. at 1497.

The constitutionality of drug testing programs was recently considered by the Supreme Court of the United

States in two cases, each decided after the circuit court's decision in the present case. *National Treasury Employees Union v. Von Raab,* — U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) involved a mandatory suspicionless urinalysis for drug use of United States Customs Service personnel who sought transfer or promotion to positions having a direct involvement in drug interdiction or to positions that required the carrying of a firearm. *Skinner v. Railway Labor Executives Ass'n,* — U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) involved Federal Railroad Administration regulations that mandated the testing of blood and urine samples for drug use by employees following certain types of major train accidents or incidents. The same regulations also authorized, but did not require, breath and/or urine tests of employees found violating certain safety rules.

These cases hold that the collection and testing of urine is a "search,"[2] and thus implicates the protections of the Fourth Amendment, *Skinner, supra,* 109 S.Ct. at 1413; *Von Raab, supra,* 109 S.Ct. at 1390; that the Fourth Amendment prohibits only those searches that are unreasonable, *Skinner, supra,* 109 S.Ct. at 1414; that reasonableness has traditionally been judged by "balancing [the] intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests," *id.;* that in most criminal cases, a search is not reasonable "unless it is accomplished pursuant to a judicial warrant issued upon probable cause," *id.;* but that exceptions to this rule are proper in non-criminal cases "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirements impracticable.' " *Id.* (citation omitted).

In *Skinner,* the Court found that

---

**2.** "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

"[t]he Government's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, 'likewise presents "special needs" beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements.' *Griffin v. Wisconsin*, 483 U.S., [868] at [874] 107 S.Ct., [3164] at 3168 [97 L.Ed.2d 709] (1987)." *Id.* 109 S.Ct. at 1414.

In the absence of such warrant and probable-cause requirements, the Court has usually required " 'some quantum of individualized suspicion' before concluding that a search is reasonable." *Id.* 109 S.Ct. at 1416–17 (citation omitted). But it has sanctioned limitations on this requirement.

"In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Id.* at 1417.

III.

(A)

*Privacy Expectations*

■ The case before us does not involve random post-employment drug testing of a broad array of government employees but rather is concerned with a mandated program, limited to uniformed police and fire personnel, conducted during the course of routine periodic physical examinations in which a urine sample is regularly produced and analyzed. The program is designed to serve needs other than law enforcement and test results may not be used for criminal prosecutions without the employee's consent. As earlier observed, the program is aimed at providing safe and efficient working conditions for these employees and to protect the public by monitoring, treating and deterring the use of illegal drugs.

The central focus of the constitutional inquiry into the City's proposed drug testing program for police and fire fighters is upon the nature of the intrusion—the actual drug analysis of the urine sample—and not upon the mandatory taking of the sample. This is so because these employees have regularly participated for several years, without objection, in providing urine specimens for analysis as part of their required periodic physical examinations. Until the advent of the City's proposed plan to test for illegal drugs in the employee's system, the specimen was analyzed for physiological explications other than drug use deemed necessary to determine physical fitness for the demands of police and fire service employment. Therefore, the inquiry before us is the degree of intrusiveness in subjecting the samples to testing of substances illegal under Maryland law.

While it is true that the actual assaying of the sample for drug use constitutes a search,[3] under facts like those now before us, the intrusion on reasonable expectations of privacy in the urine sample is not only "minimal" under *Skinner* and *Von Raab*, but negligible for several reasons.

First, in *Skinner*, the Court approved of the manner in which the regulated procedures reduced the intrusiveness of the collection process. It found that non-direct observation by a monitor and collection of the sample in a medical environment by personnel unrelated to the railroad employee to be "not unlike similar procedures encountered often in the context of a regular physical examination." 109 S.Ct. at 1418. Likewise, in *Von Raab*, the prescribed procedures of the Customs Service were held to significantly minimize the program's intrusion on privacy interests. "Employees

---

**3.** In *Skinner*, 109 S.Ct. at 1412, the Court concluded that chemical analysis of a blood sample to obtain physiological data invades the employee's privacy interests. The Court recognized further that "chemical analysis of urine, like that of blood, can reveal a host of private medical facts about an employee, including whether she is epileptic, pregnant, or diabetic." *Id.* at 1413. *See also Von Raab, supra,* 109 S.Ct. at 1390.

are ... notified in advance of the scheduled sample collection, thus reducing to a minimum any 'unsettling show of authority' that may be associated with unexpected intrusions on privacy. There is no direct observation of the act of urination ...[;] urine samples may be examined only for the specified drugs." *Von Raab, supra,* 109 S.Ct. at 1394 n. 2 (citations omitted).

As earlier noted, the covered employees in the present case have three distinct types of notice. They know in advance that their physicals are during their "birthday" months; within thirty days they will know for which week of that month the examination is scheduled; and within forty-eight hours they will know the exact time of that week in which the examination will occur. There is no observation of urination. Positive test results are strictly confidential. While the procedural safeguards appear as protective of individual privacy as those in *Skinner* and *Von Raab,* we are not here concerned with whether the collection of urine itself is intrusive on reasonable expectations of privacy grounds because the covered personnel do not object to regular physical examinations whereby a urine sample is produced. Even so, we doubt that there is a great expectation of privacy with regard to the mere unobserved passing of urine in the context of a physical examination which is accepted by the employees as necessary for their continued employment with the City.

Second, in *Skinner,* the Court's finding that the procedures were valid turned, in part, on the fact that the urine tests could not be used to inquire into private facts unrelated to alcohol or drug use. 109 S.Ct. at 1418. In the present case, the disclosure of "private facts" is part of the regular physical examination procedure. Moreover, it is expected that a physician professionally qualified in urinalysis will evaluate the contents of a urine sample for signs of physical infirmities or latent diseases. No reasonable expectation of privacy exists with regard to those facts. In *Skinner* and *Von Raab,* testing only for specified drug use was held not unreasonably intrusive. Clearly, the nature of

the intrusion in those cases is greater in degree than that involved in the case before us.

Third, in *Skinner,* the targeted railroad employees were also required to complete a form stating what medications they consumed in the thirty days prior to the tests. *Id.* at 1418 n. 7. The City's proposed program similarly requires that a medication form be completed for precisely the same reason, *i.e.,* to discover whether a positive test result may be explained by the employee's lawful use of drugs. *Skinner* found such a requirement permissible in these words:

> "While this procedure permits the Government to learn certain private medical facts that an employee might prefer not to disclose, there is no indication that the Government does not treat this information as confidential, or that it uses the information for any other purpose. Under the circumstances, we do not view this procedure as a significant invasion of privacy." *Id.*

That this procedure is calculated to assure accuracy of test results is readily apparent. *See, e.g., National Federation of Government Employees v. Cheney,* 884 F.2d 603 (D.C. Cir.1989); *Shoemaker v. Handel,* 795 F.2d 1136, 1140 (3rd Cir.), *cert. denied,* 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) and *Weicks v. New Orleans Police Dept.,* 706 F.Supp. 453, 456 (E.D.La.1988). In some instances the required disclosure of information regarding prescribed medications may invade reasonable privacy expectations, but not here. The disclosure of other private medical facts, *e.g.,* physical conditions for which the lawful medication is treatment, would naturally be the subject of inquiry during the course of a regular physical examination.

Finally, the Court in *Von Raab* found that employees involved in drug interdiction or who carry firearms should reasonably expect inquiry into their fitness and probity. It said, 109 S.Ct. at 1394, that "[b]ecause successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness." The accepted rationale for requir-

ing regular physical examinations in this case, *i.e.*, to ensure and promote physical fitness for the demands of police and fire-fighting related services, would logically extend to identifying and treating those employees with drug abuse problems. Uniformed police and fire personnel are required to meet a minimum level of fitness to sustain the demands of physical and mental stress that may arise spontaneously and in a manner not experienced by other public employees. *See, e.g.,* Maryland Code (1957, 1985 Repl.Vol.), Article 101, § 64A recognizing stress-related occupational hazards associated with fire fighting and police work and creating a presumption in favor of compensating fire and police personnel for specified ailments under the Workmen's Compensation statute. Additionally, the justified purpose of periodic physical examinations in monitoring a minimum level of health maintenance undoubtedly serves as motivation for police officers and fire fighters to stay fit. The analysis of the urine sample for the presence of illegal drugs furthers the purpose of the attendant physical examinations both to identify users of such drugs and to deter their use. Manifestly, these employees expect that their regular physical examinations be as thorough as necessary to identify health risks that would impede or impair the performance of their stressful obligations. In this context, there is little justification for excluding detection of illegal drug use which could have more adverse effects on a police officer or fire fighter than a substandard level of fitness. Illegal drug use itself can impair physical and mental performance. Plainly, the basis for drug testing here is reasonably and objectively related to the accepted purpose of medically investigating the employee's fitness for duty.

*Amalgamated Transit U. v. Cambria Cty Tr. Auth.,* 691 F.Supp. 898 (W.D.Pa.1988), involved the same issue as the present case. It dealt with mandatory drug testing of municipal bus drivers and mechanics during the course of their annual physical examinations. There, the court said:

"We find that testing as part of a regular medical examination works a minimal intrusion on the plaintiffs'

Fourth Amendment privacy interests. Since providing blood and urine samples has been part of the employees' medical examinations for at least twelve years, drug and alcohol testing does not affront any reasonable expectation in bodily integrity. Further, in earlier years, the Authority collected these samples to learn physiological secrets about the employees' health. Drug and alcohol testing merely extracts some additional, limited information from the sample: whether any of ten substances is present in the body.

"Unlike random and surprise drug testing, a routine medical examination takes place in a manner likely to allay anxieties. The employee has notice far in advance; the physical is always scheduled for his anniversary month. The Authority does not single any one out for an examination. Since everyone must submit to an examination, the worker should not suffer any stigma or shock.

"... [T]hese tests are for an administrative, not a criminal purpose. 'While the fourth amendment protects against invasions for civil as well as criminal investigatory purposes, the need for protection against governmental intrusion diminishes if the investigation is neither designed to enforce criminal laws nor likely to be used to bring criminal charges against the person investigated.' [Quoting from *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 179 (5th Cir.1987).] The Authority does not report positive results for illegal substances to law enforcement officials." 691 F.Supp. at 904.

*See also Jones v. McKenzie*, 833 F.2d 335, 340 (D.C.Cir. 1987) (mandatory drug testing of municipal bus drivers, mechanics and attendants conducted during routine, reasonably required annual medical examination minimized intrusion on privacy), *vacated sub nom., Jenkins v. Jones*, —— U.S. ——, 109 S.Ct. 1633, 104 L.Ed.2d 149, *modified on remand*, 878 F.2d 1476 (1989); *Amalgamated Transit Union v. City of Oklahoma City*, 710 F.Supp. 1321, 1331–32 (W.D.Okla.1988) (mandatory drug testing of municipal transit employees operationally involved in the transportation

service during regularly conducted medical examinations minimizes intrusiveness); *Wrightsell v. City of Chicago,* 678 F.Supp. 727, 734 (N.D.Ill.1988) (police officers returning to duty from extended leave have minimal interest in urine sample provided during employment-related medical examinations). Most of the drug testing programs in these cases were originally part of a program of regularly scheduled medical examinations, unlike *Amalgamated Transit U. v. Cambria Cty. Tr. Auth., supra* and the case before us, which involve previously established medical examinations into which the disputed drug testing procedures were later incorporated. In this regard, it is apparent that employees who already participate in regular physical examinations experience even less privacy expectations than when a physical examination program is initially implemented. *Von Raab, supra,* 109 S.Ct. at 1397; *see also Skinner,* 109 S.Ct. at 1418.

The City's proposed program is also vastly different from that in *Lovvorn, supra,* upon which the circuit court placed reliance in determining that the program violated the Fourth Amendment. In *Lovvorn,* municipal fire fighters were required to undergo drug testing of blood and urine samples in a department-wide program. The program was intended to be substantially similar to an earlier testing program in which all emergency service personnel were given formal notice six days before the actual testing. Some of the tested subjects who were required to give a urine specimen were subject to a "pat-down" at the discretion of the City Fire and Police Commissioners. Most of the fire fighters were required to give urine samples in direct observation of a Deputy or Assistant Fire Chief. The tests were not conducted pursuant to any written orders, guidelines or standards. Nor were methods for testing, handling or analyzing the urine samples or disciplinary procedures ever formalized in writing. Clearly, the unstructured and discretionary nature of that program promoted a substantially greater intrusion than does the drug testing program

here involved. Indeed, the federal district court in *Lovvorn* intimated such a distinction:

"[T]here would seem to be no constitutional difficulty with the regularly conducted physicals or the requested physicals, or a pre-employment physical, even if they involve a urinalysis for drugs, provided that they are not used as a subterfuge to conduct an unreasonable search and seizure."

*Lovvorn v. City of Chattanooga, Tenn.*, 647 F.Supp. 875, 881 n. 7 (E.D.Tenn.1986). *See also* the statement in *McDonell v. Hunter*, 612 F.Supp. 1122, 1130 n. 6 (S.D. Iowa 1985), *modified on other grounds*, 809 F.2d 1302 (8th Cir.1987):

"The Fourth Amendment, however, does not preclude taking a body fluid specimen as part of a pre-employment physical examination or as part of any routine periodic physical examination that may be required of employees, nor does it prohibit taking a specimen of blood, urine, or breath on a periodic basis as a condition of continued employment under a disciplinary disposition if such a condition is reasonably related to the underlying basis for the disciplinary action and the duration of the condition is specified and is reasonable in length."

The federal district court in *McDonell* permitted drug testing as part of a routine periodical physical examination required of prison employees. And *see City of Palm Bay v. Bauman*, 475 So.2d 1322 (Fla.App.1985) (upholding drug urinalysis of city police and fire fighters performed as part of initial or annual physical examinations, but requiring reasonable suspicion for *random* testing).

Any inquiry into reasonable expectations of privacy among government employees subject to drug testing programs manifestly requires focus on individual facts on a case-by-case basis. *See O'Connor v. Ortega, supra*, 480 U.S. at 718, 107 S.Ct. at 1499. While the City's program in this case involves mandatory rather than random testing of the covered employees, we nevertheless note the existence of a number of cases upholding the constitutionality of

suspicionless random drug testing in the public sector. *See, e.g., American Federation of Government Employees v. Skinner,* 885 F.2d 884 (D.C.Cir.1989) (suspicionless random drug testing of federal transportation workers is constitutional); *National Federation of Government Employees v. Cheney,* 884 F.2d 603 (D.C.Cir.1989) (suspicionless random urinalysis of civilian employees in military positions involving aviation, police/guard and drug abuse/treatment programs is constitutional); *Harmon v. Thornburgh,* 878 F.2d 484 (D.C.Cir.1989) (suspicionless random urinalysis of Department of Justice employees holding top secret national security clearances is constitutional); *Guiney v. Roache,* 873 F.2d 1557 (1st Cir.1989) (suspicionless random drug testing of city police is constitutional); *Policemen's Benev. Ass'n of N.J. v. Washington Tp.,* 850 F.2d 133 (3rd Cir.1988) (suspicionless random drug testing of city police is constitutional); *McDonell v. Hunter,* 809 F.2d 1302 (8th Cir.1987) (systematic random urinalysis of prison employees having daily contact with prisoners is constitutional); *Weicks v. New Orleans Police Dept.,* 706 F.Supp. 453 (E.D.La.1988) (suspicionless random urinalysis of special division members in city police department is constitutional); *Caruso v. Ward,* 72 N.Y.2d 432, 534 N.Y.S.2d 142, 530 N.E.2d 850 (1988) (suspicionless random drug testing of city police in organized crime control bureau is constitutional). Other cases have found *random* drug testing constitutional only in the presence of some degree of suspicion. *See, e.g., Copeland v. Philadelphia Police Dept.,* 840 F.2d 1139 (3rd Cir.1988) (police officers), *cert. denied,* —— U.S. ——, 109 S.Ct. 1636, 104 L.Ed.2d 153 (1989); *McDonell v. Hunter,* 809 F.2d 1302 (8th Cir.1987) (prison employees not having daily contact with prisoners); *National Federation of Federal Emp. v. Carlucci,* 680 F.Supp. 416 (D.D.C.1988) (civilian Army employees); *aff'd in part, vacated in part, National Federation of Government Employees v. Cheney,* 884 F.2d 603 (D.C.Cir.1989); *Wrightsell v. City of Chicago,* 678 F.Supp. 727 (N.D.Ill.1988) (police officers not tested as part of routine, reasonably-required medical exam-

ination); *Smith v. White,* 666 F.Supp. 1085 (E.D.Tenn.1987) (nuclear plant employees), *aff'd,* 857 F.2d 1475 (1988); *American Federation of Gov. Employees v. Weinberger,* 651 F.Supp. 726 (S.D.Ga.1986) (Department of Defense civilian police officers holding "critical" jobs); *Bostic v. McClendon,* 650 F.Supp. 245 (N.D.Ga.1986) (police officer and court clerk); *Capua v. City of Plainfield,* 643 F.Supp. 1507 (D.N.J.1986) (fire fighters); *Turner v. Fraternal Order of Police,* 500 A.2d 1005 (D.C.App.1985) (police officers); *City of Palm Bay v. Bauman,* 475 So.2d 1322 (Fla.App. 1985) (police officers and fire fighters not tested during regularly scheduled periodic physical examinations).

As the present case involves suspicionless mandatory drug testing of uniformed police and fire personnel, we have no occasion to consider whether random drug testing, not based on reasonable suspicion, unconstitutionally invades reasonable expectations of privacy. We are, however, constrained to note that a purely random physical examination program for the purpose of drug testing would likely necessitate more stringent review. This is so because privacy expectations in that posture would appear to be greater than, as here, where providing urine samples during routine physical examinations is accepted by employees as essential for continued employment in safety-sensitive professions.

### (B)

### Governmental Interests

In *Von Raab,* the Court was confronted with determining whether the governmental interest asserted by the Customs Service was sufficiently compelling to justify an infringement on privacy expectations occasioned by the drug testing program. It identified two governmental interests of a compelling nature that in some circumstances would support a drug testing program impacting upon reasonable expectations of privacy in the absence of a suspicion requirement. "It is readily apparent that the

Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Von Raab, supra,* 109 S.Ct. at 1393. Likewise, "[t]he public interest ... demands effective measures to prevent the promotion of drug users to positions that require the incumbent to carry a firearm, even if the incumbent is not engaged directly in the interdiction of drugs." *Id.* The Court agreed with the Customs Service that "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force." *Id.* The Court apparently equated such risks to those in *Skinner* where even a momentary lapse of attention by certain railroad employees could cause "disastrous consequences," before any signs of impairment become noticeable by supervisors or others. *Id.; see also Skinner, supra,* 109 S.Ct. at 1419.

Police officers in Annapolis encounter similar if not equal levels of danger as the Customs Officers in *Von Raab* who carry firearms. Police are presented each day with unanticipated dangers; they are often called to respond quickly and instinctively to situations that may require the use of deadly force. They are permitted to carry firearms whether on duty or off, and are vested with individualized discretion in the use of those firearms. Mistakes in judgment or perception while using deadly force or while operating a vehicle at high speeds could give rise to the same injurious consequences as a momentary lapse of attention attributable to drug use. Fire personnel are also uniquely charged with duties to respond quickly and effectively at a moment's notice. Impaired abilities caused by drug use may beget delays in responding to fires or other public emergencies. A few minutes could mark the difference between saving one or several occupants in a building, or losing the occupants and/or the structure in a blaze. As noted in *Lovvorn, supra,* 846 F.2d at 1544:

> "Fighting fires is perhaps the most dangerous and hazardous of all professions. It is imperative that those who

are charged with the public responsibility of extinguishing fires, sometimes risking their own lives for the sake of someone trapped, be free of the debilitating influences of controlled substances. It is well established that the use of such substances, such as marijuana, can adversely affect one's perception, decision-making time, short-term memory, motor skills, and judgment. Firefighters so affected become a risk to themselves, their fellow fire fighters, and those depending on them for rescue. We have no hesitation, therefore, in recognizing the compelling nature of the City's interests in keeping its fire fighters free from the effects of illegal drugs."

We recognize that *Von Raab* seemingly expressed the view that Customs Officers at the nation's borders may encounter threatening circumstances greater than elsewhere in the country, and that considerable deference was therefore due to the government when conducting "national security" services. However, the mission of municipal police officers can hardly be minimized for they are indeed "front-line soldiers" charged on a day-to-day basis with the onerous and dangerous duty of drug interdiction within their jurisdiction. City fire fighters also assume a responsibility for twenty-four hour preparedness in answering all calls, no matter the degree of danger involved. The daily work of police and fire personnel clearly "depends uniquely on their judgment and dexterity." *See, Von Raab, supra,* 109 S.Ct. at 1394. The City's interest in the safety of uniformed police or fire personnel, their co-workers, and the public served by them is of a sufficient compelling nature that, in our view, substantially outweighs the negligible private interest here involved. The nature of the intrusion in the City's drug testing program is, we think, significantly less than that in *Von Raab*, while the governmental interest must be afforded comparable weight.

### Suspicionless Drug Testing

As already noted, there is not a great privacy expectation in the drug analysis of employees' urine produc-

ed in this regular examination procedure. A warrant requirement would add little protection to that privacy. The essential purposes of a warrant are protecting privacy interests from arbitrary acts of government and ensuring that only objective determinations shall conclude when an intrusion is justified. *Skinner, supra,* 109 S.Ct. at 1415. Those purposes are not here jeopardized; there is simply no room for abuse of discretion involved with the City's testing procedure. In *Von Raab,* the Court said, "[b]ecause the [Customs] Service does not make a discretionary determination to search based on a judgment that certain conditions are present, there are simply 'no special facts for a neutral magistrate to evaluate.'" *Von Raab, supra,* 109 S.Ct. at 1391 (citation omitted). Similarly, the City's program requires suspicionless drug testing only in the context of an employee's physical examination, which occurs only in the month of the employee's birthday. The most frequent testing is once a year; others are either tested once every two years or once every three years. There is absolutely no discretion exercised in determining when an employee will be tested for drugs; the potential for abuse or harassment by the employer is negligible at best.

Under the City's program, as with the program in *Skinner,* "the circumstances justifying toxicological testing and the permissible limits of such intrusions are defined narrowly and specifically ..., and doubtless are well known to covered employees." *Skinner,* 109 S.Ct. at 1415. The City's program states clearly, without question, the circumstances and limitations of the drug testing during the physical examinations.

A reasonable suspicion requirement is unwarranted under the facts before us. The intrusion invades no privacy interest sufficient to counter the compelling interest in deterring and detecting the drug-impaired fitness of uniformed police and fire personnel. Merely because there presently is no known illegal drug use among the covered employees does not compel its condemnation on Fourth Amendment grounds. A documented drug problem need

not exist within the place of employment. *See Von Raab,* 109 S.Ct. at 1395, where the Court held that the value in deterring drug use among the Custom Service officers was as equally compelling as the goal of preventing the promotion of drug users to sensitive positions in the Service. Although the advance notice provisions here may arguably enable some employees to avoid detection in some instances, an employee who uses illegal drugs is nevertheless at risk in producing a positive test result. An addict may find it impossible to abstain; an occasional user cannot predict with certainty the time in which the body removes all traces of a particular drug. The risk of detection may prevent an employee from continuing or even initiating the use of illegal drugs. The City program is plainly structured toward deterring illegal drug use in the same manner as in *Von Raab.*

Because there are substantial risks to even one employee acting in the line of duty while impaired by drugs, an employer does not act unreasonably by not awaiting the occurrence of such an incident before initiating a drug testing program. A reasonable suspicion requirement assumes that another employee, supervisor, or an informant will detect and report the illegal drug use. It further assumes that an observer is capable of detecting drug impairment. A clear possibility exists that a police or fire employee under the influence of drugs may escape detection for a short time-period. The nature of police and fire related employment involves emergencies. At times any given employee may be indispensable. The City could reasonably have determined that to expect employees to monitor their co-workers for drug impairment during unexpected occurrences demanding immediate action would likely jeopardize the need for safe and responsive police and fire departments.

With regard to drug use detection, the reasoning in *Von Raab* is applicable here. "Detecting drug impairment on the part of employees can be a difficult task, especially where, as here, it is not feasible to subject employees and

their work-product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Id.* at 1395. Although individual police and fire employees may spend much of their working time in the presence of co-workers, there are many occasions when they are off-duty and beyond routine observation. Off-duty drug use can certainly impair on-duty job performance. Furthermore, these employees, even while off-duty, may be called to respond to certain emergencies. Indeed, there is a compelling government interest here, as in *Von Raab,* in ensuring that the employees do not use illegal drugs even while off-duty. Possible detection of drug impairment in those circumstances is difficult, if not impossible, until the moment that the employee is called into action. Obviously, this is too late. The drug testing here serves the same ultimate objective of the regular physical examinations, *i.e.,* detection of problem before an employee is physically impaired in his or her job.

## IV.

For the reasons stated, we conclude that the circuit court erred in enjoining the City "from implementing and enforcing the mandatory drug testing program at issue in this case." In so holding, we do no more here than find that the proposed drug testing program of police and fire personnel, as set forth in the Appendix to this opinion, is not facially at odds with the Fourth Amendment simply because it is not based on reasonable suspicion of illegal drug use by covered employees.[4]

---

**4.** The unions and Amicus Curiae suggest that the warrant and unreasonable search and seizure provisions of Article 26 of the Maryland Declaration of Rights are violated by the City's proposed drug testing plan. This is so, they contend, even if we find that the Fourth Amendment has not been violated. Of course, the two constitutional provisions are *in pari materia,* and while each provision is independent of the other, we find no basis for concluding that Article 26 is transgressed under the facts of this case. *See Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 532, 479 A.2d 921 (1984); *Gahan v.*

JUDGMENT REVERSED; COSTS TO BE PAID BY
THE APPELLEES, UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL 400, et al.

## APPENDIX

### *City of Annapolis*

### *Drug Testing Policy and Procedure*

Policy Overview:

The City of Annapolis has a vital interest in maintaining
safe, healthful and efficient working conditions for its em-
ployees. Being under the influence of a drug or alcohol on
the job may pose serious safety and health risks not only to
the user, and to those who work with the user, but also to
the public we serve. The possession, use or sale of an
illegal drug or alcohol in the work place may also pose
unacceptable risks for safe, healthful and efficient opera-
tion.

The City of Annapolis recognizes that its own health and
the ability to provide a safe and high level of service to our
citizens are dependent upon the physical and psychological
health of its employees. Accordingly, it is the obligation
and intent of the City to maintain a safe working environ-
ment, to protect City property, equipment and operations,
and to provide for the welfare of its citizens and visitors.

With these basic objectives in mind, the City has estab-
lished a drug testing program for City employees engaged
in public safety, management, and other critical positions
where the safety and health of its employees and citizens
could be placed in jeopardy by the use of illegal substances.

Positions Affected:

    Uniformed Police

    Uniformed Fire

    Department Directors

---

*State,* 290 Md. 310, 319–20, 430 A.2d 49 (1981) and *Attorney General v.
Waldron,* 289 Md. 683, 714, 426 A.2d 929 (1981).

When Tests Will be Conducted:

Uniformed members of the Police and Fire Departments and Department Directors are subject to periodic physicals during the course of their employment. Physicals are scheduled based on the employee's age as follows:

18 thru 29 years of age—every 3 years

30 thru 39 years of age—every 2 years

40 + years of age—every year

Drug testing will be conducted as a part of the scheduled physical by testing the urine routinely collected as part of that physical.

Scheduling of Physicals:

Affected employees are scheduled for physicals to be conducted during their "birthday" month.

Thirty (30) days prior to the physical the employee will be notified of the week during the "birthday" month during which the physical will be conducted.

The employee will be notified at least 48 hours prior to the actual time of the examination.

(Example: If your birthday is in February and this is the year for your physical to occur, you already know that the physical will be scheduled to be conducted sometime in February. Assume for this example that we have scheduled your physical 9:00 am, Thursday, February 18. At least 30 days prior to that date you will be notified that your physical will be scheduled for the third week in February. forty-eight (48) hours prior to the examination (by 9:00 am, Tuesday, February 16) you will be notified of the date and time your physical examination will be conducted).

Collection Site:

Primedical, 2661 Riva Road, Annapolis, Maryland has been designated as the site where periodic physicals will be conducted, including the collection of the urine sample upon which the drug test will be performed.

Collection Protocol:

Procedures for collecting urine samples shall allow individual privacy and shall not be observed.

1. Identify patient (Photo ID), patient signs consent/release form
2. Medication form filled out, signed by both patient and collector, and reviewed with patient. NOTE: The patient *must be able to provide proof of prescription listed; either a vial, a letter or written prescription from their doctor.*
3. Sample Collection Procedure:
   a. Patient removes coats, jackets, etc.
   b. Patient is escorted to bathroom and given urine cup (Note: To prevent tampering, bathroom should be cleared of any soap or chemicals; tap may be turned off; wastebasket is removed so that a smuggled-in sample container cannot be disposed of easily).
   c. Patient hands urine cup to collector. Sample should not leave patient's or collector's sight until sealed and labeled. Sample is to be examined for temperature, color, turbidity. If there are any suspicions about the sample, the patient can be requested to submit another sample immediately.
   e. Sample is placed into CompuChem Container and sealed. Patient signs that the sample is his.
   f. Order Entry/Chain of custody form is completed.
   g. Sample is stored in refrigerator until picked up by courier.
4. *Inadequate Sample*—If testing lab calls collector with info that sample is not suitable for testing (leaky container, improper documentation, etc.) the person will be called and the same procedure will be followed from step 1.

Designated Laboratory:

Maryland Medical Laboratory, Inc., Main Office: 1901 Sulfur Spring Road, P.O. Box 24080, Baltimore, Maryland

**570**

21227–0580 has been designated as the laboratory to conduct tests upon urine collected during the periodic physical.

Both initial drug screening and confirmatory testing of positive specimens shall be conducted by Maryland Medical Laboratory.

Independent Testing:

Employees may request independent testing of the same sample by another laboratory approved by the State Department of Health and Mental Hygiene in order to verify the test results, but the cost of such tests will be borne by the employee.

Test Results:

Test results, positive and negative, will be hand delivered by laboratory courier to the Personnel Director in sealed envelopes as is now the procedure for routine laboratory findings resulting from the periodic physical. The Personnel Director will immediately order the laboratory to conduct confirmatory testing for all samples reported as positive on the initial test.

Record Security and Access:

Results of positive tests (initial and confirmatory) will be filed separate from an employee's personnel file. Such file shall be in the Personnel Director's office and shall be locked when unattended. Access to positive test results shall be restricted to:

Personnel Director

Employee

Those authorized in writing by the employee.

Rehabilitation and Treatment:

As part of its drug testing program, it shall be the policy of the City to rehabilitate, not retaliate. It shall be the intent of the City to refer employees, who have been confirmed through testing to be users of controlled dangerous substances (Maryland Annotated Code, article 27,/s276 et seq.), to counselors at external agencies for evaluation

and counseling or further referral to appropriate outpatient or inpatient treatment facilities. Professional counselors will make this determination for treatment and the extent of the problem.

Procedure:

1. Personnel Director, based on the confidential results of a confirmed positive drug test, will notify the employee verbally that there is a confirmed positive test.

   a. Employee will be given a phone number to call immediately for a counseling appointment at no cost to the employee.

   b. Personnel Director will authorize the facility to make the counseling appointment and request verification when the appointment is made.

2. If the employee has failed to make an appointment within two (2) working days, the Personnel Director will convey the results and referral instructions to the employee by letter to the employee's last known address.

3. If the employee fails to make an appointment within five (5) working days of the date of the notifying letter, the employee's department head will be notified by the Personnel Director of the employee's failure to comply. (We feel that an Employee Assistance Program that provides this initial assessment, counseling, and referral for treatment or rehabilitation is a critical and mandatory component in our rehabilitation efforts. Failure of the employee to avail him or herself of this assistance must not be taken lightly and every effort must be made to have the employee's problem assessed to determine if indeed a substance abuse problem exists, and if so, the extent of the problem).

4. The counseling and referral service will determine during the initial appointment if a substance abuse problem exists and the extent of the problem. A determination will be made to refer the employee to either outpatient, inpatient treatment, or no treatment indicated.

5. Employees will be allowed to use available accrued sick leave or authorized leave of absence while undergoing treatment.

6. Treatment programs are covered by the City's health plan through specific riders covering alcohol, drug, and psychological counseling and treatment.

7. The Personnel Director will be provided periodic updates on the treatment progress of the employee.

8. The City's Disability Insurance program may be applied for by the employee during the period of treatment.

9. If the employee is referred to the 28 day inpatient treatment facility, their position (job) will be held open pending their return at the completion of the treatment program.

10. If the employee is referred to an outpatient program, and allowed to remain on the job while undergoing rehabilitation, dependent upon the severity and depth of the substance dependency, as determined by initial assessment counseling, and upon advice of the counseling professional, the Personnel Director may, in consultation with the Department Director order the employee to be placed in administrative duties until sufficient rehabilitation has occurred as specified by the treating agency in writing.

11. Following rehabilitation, and treatment, and the employee's return to full duties, the employee may be subject to random testing by the employer based on reasonable suspicion.

12. A second positive test result during the term of employment with the City will result in charges and dismissal subject to grievance and appeal procedures in effect.

Voluntary Treatment:

Nothing in this program shall prohibit employees from voluntarily seeking counseling and treatment.