240 N.J. Super. 9 (1990)
572 A.2d 204
INTERNATIONAL FEDERATION OF PROFESSIONAL & TECHNICAL ENGINEERS, LOCAL 194A, AFL/CIO-CLC; FRANCIS A. FORST, INDIVIDUALLY AND AS BUSINESS MANAGER OF LOCAL 194A, ROBIN R. HELLER AND VINCENT DINUCCI, PLAINTIFFS-RESPONDENTS,
v.
BURLINGTON COUNTY BRIDGE COMMISSION; J. GARFIELD DEMARCO, JAMES LOGAN, JR. AND EVA WEISS, INDIVIDUALLY AND AS COMMISSIONERS OF THE BURLINGTON COUNTY BRIDGE COMMISSION; AND FRANCIS J. OTT, INDIVIDUALLY AND AS EXECUTIVE DIRECTOR OF BURLINGTON COUNTY BRIDGE COMMISSION, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 1989.
Decided March 26, 1990.
*11 Before Judges O'BRIEN, HAVEY and STERN.
Stacy L. Moore, Jr., argued the cause for appellants (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, Jr., of counsel; Richard M. Berman, on the brief).
John F. Pilles, Jr., argued the cause for respondents (Schlesinger, Schlosser & Foy, attorneys; John F. Pilles, on the brief).
The opinion of the court was delivered by STERN, J.A.D.
We hold that the drug testing of public employees physically involved in the opening and closing of bridges which cross the Delaware River may be conducted as part of an annual physical examination. Our holding is based on the totality of circumstances presented, including the nature of the work performed by the employees to be tested, the non-random nature of the test, and the fact that the test is to be conducted as part of the employee's annual physical examination. We further conclude, however, that the procedures for the conduct *12 of such examinations are subject to negotiation between the employer and employee. Accordingly, we remand for further proceedings.

I.
In complaints filed in both the Federal District Court and the Law Division, all plaintiffs sought to overturn the dismissal of plaintiffs Robin R. Heller and Vincent DiNucci by defendant Burlington County Bridge Commission (hereinafter "defendant" or "the Commission") on the ground that the drug testing procedure to which they had been subjected was illegal. The federal action was dismissed by consent, "without prejudice to reinstatement should the state court decline, for any reason, to hear and adjudicate all issues as alleged in the complaint."
In the State complaint, plaintiffs alleged, among other things, that the drug tests violated the individual-employee plaintiffs' rights under the First, Fourth, Fifth and Ninth Amendments to the Federal Constitution and Article I ¶¶ 1, 2 and 7 of the State Constitution; impaired their rights as public employees to negotiate terms and conditions of employment, and violated New Jersey's Law Against Discrimination and specifically N.J.S.A. 10:5-4.1. In addition to demanding reinstatement, plaintiffs sought to enjoin defendants from performing drug tests on other employees. In their answer defendants asserted (1) they "had probable cause to believe that [Heller and DiNucci] were using drugs and [were] under the influence of drugs during their regular daily work routines"; (2) plaintiffs' duties implicated the public's safety; (3) plaintiffs consented to drug testing; and (4) plaintiffs waived their rights to object to the testing by virtue of their failure to object to it at their disciplinary hearing.
Cross motions for summary judgment were filed, and on June 15, 1988 the motion judge invalidated the drug tests on constitutional grounds and ordered that plaintiffs be reinstated.

*13 II.
The facts are not substantially in dispute, and we adopt the essential fact-finding embodied in the motion judge's written opinion:
The [defendant] Burlington County Bridge Commission is a public agency operating under N.J.S.A. 27:19-26 et seq. ...
The International Federation of Professional and Technical Engineers, AFL-CIO, Local 194A (herein "Local" or "Local 194A") represents the permanent employees of the Commission who are assigned to the Tacony Palmyra and Burlington Bristol Bridges. The Local and the Commission have executed a collective bargaining agreement which is silent as to any physical examination requirements. However, all job applicants, before employment, and all bascule[1] and lift-span operators, annually, have been subjected to physical examinations. The examinations, which included urine testing for other than drug use, were undertaken at the Zurbrugg Memorial Hospital. In 1986 the Hospital recommended annual drug screening by urinalysis for all bascule and lift-span operators, a procedure then being used in connection with pre-employment examinations. This recommendation was sent to the Commission's Personnel Administratrix who accepted it after obtaining approval from the Commission's Executive Director. No formal action was taken by the Commission itself.
[Plaintiffs] Robin R. Heller and Vincent DiNucci are commission employees and members of the Local. Heller's employment commenced on September 17, 1976; he was promoted to bascule operator on March 17, 1986. DeNucci's employment commenced on January 28, 1975; he was promoted to lift-span operator on December 1, 1981. Both employees were identified as drug users on the basis of results obtained from drug tests performed during their May 22, 1986 annual examination and were suspended for that reason on May 29, 1986, which date became effective for termination purposes after the employees were given a hearing.
Bascule and lift-span operators control the raising and lowering of the Commission's bridges, permitting the passage of ships moving up and down the Delaware River. Their job is important, not only to the safety of ships, but also to the safety of motorists and pedestrians crossing the bridges.
Heller and DiNucci were not aware of the required drug screening procedure until they presented themselves to the Occupational Health Co-Care Unit at Zurbrugg where they were advised of the drug test, and asked to sign a written consent form. Heller offered no resistance, asked no questions, signed the form and submitted to the urinalysis. DiNucci inquired as to the reason for the screen and was advised to call the Commission's Personnel Administratrix for an answer. He ignored that opportunity, signed the form and submitted to the *14 test. Heller's urinalysis revealed the presence of amphetamine, methamphetamine, morphine and marijuana, DiNucci's, the presence of marijuana. The Hospital rendered no opinion as to whether the drug usages were recent or otherwise.
The Commission's Executive Director, having learned of the test results, suspended both Heller and DiNucci without pay pending their submission to requested blood tests which they did not take. On June 17, 1986 the Commission met, considered the suspensions and, by letter dated June 20, 1986, advised both men that a hearing would be held, followed by final disciplinary action. The hearing took place on September 4, 1986; a letter from the Executive Director dated October 23, 1986 terminated Heller and DiNucci's employment, effective May 29, 1986.
The September 4, 1986 hearing was conducted by a Bridge Commissioner. He received several documents in evidence and heard testimony from the Commission's Personnel Administratrix, its Executive Director and the doctor in charge of the laboratory which performed the drug tests. The Commissioner's opinion underlined the significant safety responsibilities of bascule and lift-span operators. He noted the doctor's opinion that both employees would be impaired, not only while drugs were being used but also over periods of time subsequent to such use. The Commissioner found the employees activity to be "a violation of the criminal laws of the State of New Jersey, with possible catastrophic effects on the health, safety and welfare of the public." He therefore recommended that both Heller and DiNucci be terminated from employment.

III.
The motion judge concluded that drug testing can survive constitutional attack only if grounded in a "reasonable individualized suspicion," based on reason to believe that the employees had been working while drug impaired. Defendants do not now justify the testing on that basis; rather, they insist that the judge was wrong to impose such a precondition, and urge that their program be sustained without the need to show particularized suspicion. They stress the reasonableness of the testing, given their need to protect the public safety, and contend that their mandated program must be sustained under case law upholding "administrative searches" in highly regulated industries.
The motion judge began with the undisputed premise that a urine test is a search and seizure in the constitutional sense, and we agree. Skinner v. Railway Labor Exec. Assn., *15 ___ U.S. ___, ___, 109 S.Ct. 1402, 1412-13, 103 L.Ed.2d 639, 659-660 (1989); Treasury Employees v. Von Raab, ___ U.S. ___, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685, 701 (1989); Harmon v. Thornburgh, 878 F.2d 484, 487 (D.C. Cir.1989), cert. den. sub nom. Bell v. Thornburgh, ___ U.S. ___, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). Thus, he concluded the issue to be decided was whether the search and seizure was "reasonable" under any of the exceptions to the prohibition against warrantless searches. Since the search in this case was not for the purpose of a criminal prosecution, the judge observed that "less than a probable cause standard" had to be shown.
In searching for the proper standard, the motion judge considered two New Jersey cases. First, he relied on Fraternal Order of Police v. City of Newark, 216 N.J. Super. 461, 524 A.2d 430 (App.Div. 1987), which he deemed "binding." In that case the Newark police director issued a directive ordering all members of the Narcotics Bureau to submit to urine-drug testing upon transfer into the Bureau and at least twice yearly thereafter. The trial court upheld the directive against an attack under the New Jersey and United States Constitutions, but on appeal we reversed. Id. at 465, 524 A.2d 430. We rejected the city's theory (also raised by defendants here) that the testing was valid under the "pervasively regulated industry" exception to the probable cause requirement, such as had been applied to the casino, racing and public utility industries. Id. at 468-469, 524 A.2d 430. We declined to extend that exception to public employees such as police, who were engaged in a non-commercial enterprise and who were not subject to a comprehensive regulatory scheme. Id. at 469, 524 A.2d 430. Rather, we concluded that the issue required consideration of a balancing test which weighed the extent of the governmental need against the degree of the invasion of the individual's privacy interests, id. at 470-471, 524 A.2d 430, an approach subsequently developed in Von Raab and Skinner, supra.
In reviewing the drug-testing cases elsewhere, in the Fraternal Order case we found that "[v]irtually all of the reported *16 cases have concluded that [drug/urine testing of public employees] is unconstitutional in the absence of some reasonable individualized suspicion." Id. at 471-472, 524 A.2d 430 (citing cases). Our holding was based "exclusively on Article I, ¶ 7 of the New Jersey Constitution," particularly because "our state constitution has been found to afford greater protection against unreasonable searches and seizures than may be required by the United States Supreme Court's interpretation of the Fourth Amendment." Id. at 477, 524 A.2d 430.
The other case relied on by the motion judge was Allen v. Passaic Cty., 219 N.J. Super. 352, 530 A.2d 371 (Law Div. 1986), in which the court refused to enforce, in the absence of "reasonable suspicion", a county sheriff's directive requiring his employees to undergo urine-drug tests "no less than twice and no more than four times annually." Id. at 383, 530 A.2d 371. There, the court concluded that a "reasonable suspicion standard" should be applied because of the constitutional requirement that government "must be able to point to specific objective facts" suggestive of reasonable suspicion directed to a specified person. Id. at 380, 530 A.2d 371. Thus, in Allen, the Law Division refused to enforce the policy of random searches with respect to all employees, since it did not require prior suspicion. Id. at 381-382, 530 A.2d 371.[2]
Similarly, here the motion judge found the absence of the requisite "reasonable suspicion standard for urine testing of New Jersey public employees in a non-criminal setting." The judge found that there were no such "reasonable individualized suspicions of Heller and DiNucci"; indeed, "[t]hey were given their tests routinely, as part of the Commission's informally adopted drug screening physical examination policy." Hence, *17 that "policy," insofar as it did not require individualized suspicion, was found to be unenforceable.[3]

IV.
In our view, there is a crucial factual difference between the tests involved in this case and those in the Fraternal Order and Allen cases. Those tests were to be conducted at random, whereas these were part of the routine annual physical examination to be given to all bascule and lift-span operators; and as Judge Gaulkin expressly noted in Fraternal Order, "[d]rug testing that is conducted as part of a bona fide health checkup is not constitutionally objectionable." 216 N.J. Super. at 469 n. 6, 524 A.2d 430. Similarly, in Allen, Judge Mandak limited the injunction to random searches, stating that "[t]he requirements of physicals at the commencement of employment or regular annual physical checkups are common and normal employment practices and should not be deemed as rendered impermissible by this decision." 219 N.J. Super. at 381, 530 A.2d 371.[4]
The reason that drug testing during routine scheduled physicals is less objectionable than random tests is that employees have a lower expectation of privacy as to such testing, and thus the testing is only minimally intrusive. See Jones v. McKenzie, 833 F.2d 335, 340 (D.C. Cir.1987), (upholding routine examination of school bus attendant), vac. and rem. for further consideration, sub. nom. Jenkins v. Jones, ___ U.S. ___, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989); Amalgamated Transit U. v. Cambria Cty. Tr. Auth., 691 F. Supp. 898, 902 (W.D.Pa. 1988) (no Fourth Amendment violation in a transit authority's policy of drug testing bus drivers and mechanics during annual physical *18 exams). In Amalgamated Transit the fact that the testing was done "as part of a bona fide annual physical examination" was found to guard against "arbitrary invasions by government officials" of legitimate individual rights to security and privacy. Ibid.
In Skinner, supra, the Supreme Court reviewed regulations of the Federal Railroad Administration which mandated blood and urine tests of railroad workers involved in certain kinds of train accidents. The regulations had been adopted in response to evidence that alcohol or drug abuse was a contributing factor in many such accidents.
The Court began its analysis by reaffirming the well-settled principle that blood and urine testing is a search and seizure which triggers the protections of the Fourth Amendment. ___ U.S. at ___-___, 109 S.Ct. at 1412-1413, 103 L.Ed.2d at 659-660. The question to be decided, however, was whether the search in that case was reasonable, since the Fourth Amendment proscribes only those searches which are unreasonable. Id. at ___, 109 S.Ct. at 1414, 103 L.Ed.2d at 661. The Court concluded that reasonableness must be judged by a balancing test, weighing the degree of intrusion into the employee's interests in privacy against the importance of the government's interest in the testing. Ibid.
The Court recognized that reasonableness normally requires either a warrant or probable cause but that exceptions are countenanced when "special needs," unrelated to criminal prosecutions, render the normal process impracticable. Ibid. Such a "special need" is presented by the government's "interest in regulating the conduct of railroad employees to ensure safety." Ibid. However, even a "special need" search is subject to the requirement that it be reasonable under all the circumstances, and reasonableness must generally be grounded in "individualized suspicion." Id. at ___, 109 S.Ct. at 1417, 103 L.Ed.2d at 664. Nevertheless, the Court observed that that condition is not always constitutionally required:

*19 In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. We believe this is true of the intrusions in question here. [Ibid.]
As to the urine tests, the Court in Skinner cited the following factors weighing in favor of reasonableness: (1) the regulations allowed the urine samples to be produced in private, out of the presence of a monitor and the samples were to be "collected in a medical environment, by personnel unrelated to the railroad employer, and [are] thus not unlike similar procedures encountered often in the context of a regular physical examination", id. at ___, 109 S.Ct. at 1418, 103 L.Ed.2d at 666; (2) railroad employees had a lower expectation of privacy "by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees", id. at ___, 109 S.Ct. at 1418, 103 L.Ed.2d at 666, and (3) the government's "compelling", at ___, ___, 109 S.Ct. at 1419, 1421, 103 L.Ed.2d at 667, 670, and "surpassing", id. at ___, 109 S.Ct. at 1421, 103 L.Ed.2d at 670, interests in transportation safety, an interest that could not be adequately protected by testing based only on individualized suspicion. See National Federation of Federal Employees v. Cheney, 884 F.2d 603, 608 (D.C. Cir.1989) cert. den. ___ U.S. ___, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990).
In contrast to this relatively slight impairment of the workers' interests, the Skinner Court found the government's "interest in testing without a showing of individualized suspicion [was] compelling." ___ U.S. at ___, 109 S.Ct. at 1419, 103 L.Ed.2d at 667. As the Court explained:
Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences. Much like persons who have routine access to dangerous nuclear power facilities, see, e.g., Rushton v. Nebraska Public Power Dist. 844 F2d 562, 566 (CA8 1988); Alverado v. Washington Public Power Supply System, 111 Wash 2d [424], at 436, 759 P2d [427], at 433-434 [1988], employees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others. An impaired employee, the Agency found, will seldom display any outward *20 "signs detectable by the lay person or, in many cases, even the physician." 50 Fed Reg 31526 (1985). [Ibid.]
In sum, the Skinner Court found no Fourth Amendment violation in testing for drugs in the absence of individualized suspicion, given the great public-safety interest of government, the minimal impairment of the workers' privacy interests and the diminished privacy expectations of those choosing to work in such a closely regulated field. Id. at ___, 109 S.Ct. at 1421-1422, 103 L.Ed.2d at 670-671.
This case is factually different from Skinner in that the urine tests are conducted during routine annual physicals, and not after the occurrence of an accident.[5] However, that distinction is not dispositive as evidenced by the holding of the Supreme Court in Treasury Employees v. Von Raab, supra, decided the same day as Skinner.
In Von Raab, the Supreme Court considered regulations adopted by the United States Customs Service for a drug-testing program  by means of urinalysis  for all existing employees who applied for transfer or promotion to positions (1) involving drug interdiction, (2) requiring the handling of firearms, or (3) giving access to classified materials. Applying the principles of Skinner, the Court held that the government's "special needs" to keep drug enforcement personnel free from their own drug usage, and to keep them alert while using firearms, justified a departure from the usual individualized suspicion requirement. ___ U.S. at ___-___, 109 S.Ct. at 1390-1393, 103 L.Ed.2d at 702-705. These "special needs" outweighed the interference with personal liberty which a urine test would cause. Id. at ___-___, 109 S.Ct. at 1393-1394, 103 L.Ed.2d at 705-706. The Court recognized that the "operational realities" of certain types of government employment may diminish privacy expectations with respect to body *21 searches. Id. at ___-___, 109 S.Ct. at 1393-1394, 103 L.Ed.2d at 705-706. Customs employees who are charged with drug interdiction and with carrying firearms "reasonably should expect effective inquiry into their fitness and probity." Id. at ___, 109 S.Ct. at 1394, 103 L.Ed.2d at 706.
The employees in Von Raab, like the plaintiffs here, argued that the testing program was unreasonable because it was not prompted by any evidence of a drug problem among Customs Service employees. However, the Court rejected the premise that testing must be preceded by objective indicia that it will uncover drug usage:
Petitioners do not dispute, nor can there be doubt, that drug abuse is one of the most serious problems confronting our society today. There is little reason to believe that American workplaces are immune from this pervasive social problem, as is amply illustrated by our decision in Railway Labor Executives. See also Masino v. United States, 589 F2d 1048, 1050 [218 Ct.Cl. 531] (Ct Cl 1978) (describing marijuana used by two Customs Inspectors). Detecting drug impairment on the part of employees can be a difficult task, especially where, as here, it is not feasible to subject employees and their work-product to the kind of day-to-day scrutiny that is the norm in more traditional office environments. [Id. at ___, 109 S.Ct. at 1395, 103 L.Ed.2d at 707.]
Equally unpersuasive was the argument that testing had not revealed many abusers:
The mere circumstance that all but a few of the employees tested are entirely innocent of wrongdoing does not impugn the program's validity. The same is likely to be true of householders who are required to submit to suspicionless housing code inspections, see Camara v Municipal Court, 387 US 523, 18 L Ed 2d 930, 87 S Ct 1727 (1967), and of motorists who are stopped at the checkpoints we approved in United States v. Martinez-Fuerte, 428 US 543, 49 L Ed 2d 1116, 96 S Ct 3074 (1976). The Service's program is designed to prevent the promotion of drug users to sensitive positions as much as it is designed to detect those employees who use drugs. Where, as here, the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal. [Id. at ___, 109 S.Ct. at 1395, 103 L.Ed.2d at 708, footnote omitted].
See also Guiney v. Roache, 873 F.2d 1557 (1 Cir.1989), (remanding for further consideration in light of Skinner and Von Raab), cert. den. ___ U.S. ___, 110 S.Ct. 404, 107 L.Ed.2d 370 (1989); Policemen's Benev. Ass'n of N.J. v. Washington Tp., 850 F.2d 133, 141 (3 Cir.1988), cert. den. ___, U.S. ___, 109 S.Ct. *22 1637, 104 L.Ed.2d 153 (1989) (upholding a New Jersey township's plan for (1) suspicionless, random drug testing of policemen and (2) drug testing of police as part of their annual medical examination, noting the highly regulated nature of the "police industry" and the "need in a democratic society for public confidence, respect and approbation of" those on whom the State confers the "awesome power" to use force in arresting its citizens); Jones v. McKenzie, supra, (remanded for reconsideration in light of Skinner and Von Raab although the testing was upheld by the D.C. Circuit); Annotation, "Drug Testing of Public Employees," 86 A.L.R.Fed. 420 (1988).
As recently noted in Harmon v. Thornburgh, supra, 878 F.2d at 488-489, a "random" drug testing case:
The Von Raab majority made no effort to articulate an analytical rule by which legitimate drug-testing programs could be distinguished from illegitimate ones. It simply weighed individual privacy interests against the government's policy objectives, enumerating several factors that it deemed relevant in performing this balancing process. The Court did not, however, indicate whether it deemed the case a close one, in the sense that minor variations in the facts would have tipped the balance in the other direction. Nor did it indicate which (if any) of the relevant factors was essential to a constitutional testing plan. (Footnote omitted; emphasis in original).
As a result of Skinner and Von Raab it appears that nothing in the federal constitutional law prevents drug testing of public employees whose positions involve the public safety, by the taking of urine samples particularly during an annual or regularly scheduled physical exam, even where there is no reasonable suspicion that the tested individuals are drug users.[6] However, the drug testing must serve some "special needs" of the employing governmental body, rather than being designed to gather evidence for a criminal prosecution. Even if the "special need" appears, the individual's privacy interest must be balanced against the public employer's interest. We recognize *23 there was no notice with respect to the drug test component of the May, 1986 physicals. Compare the procedure in Von Raab where an "independent contractor contacts the employee to fix the time and place for collecting the sample." ___ U.S. at ___, 109 S.Ct. at 1388, 103 L.Ed.2d at 699. However, we uphold that examination, even if deemed "random," under the totality of circumstances, because of the nature of the employment and the exam which was part of the annual physical and for which a urine specimen was routinely taken. In cases where the public safety depends on the fitness of employees, courts have recently upheld even random drug tests. See e.g., Harmon v. Thornburgh, supra; Rushton v. Nebraska Public Power Dist., 653 F. Supp. 1510 (D.Neb. 1987) aff'd 844 F.2d 562, 566-567 (8 Cir.1988) (upholding random testing of nuclear power plant workers, given the great potential for danger and resulting lowered expectation of privacy).
It appears insignificant that the initial May, 1986 drug screen may be deemed "random." The governing "balancing test" now appears to be the same for "random" as well as post-accident (Skinner) or "pre-ascension" (Von Raab) type drug testing. As very recently said in National Federation of Federal Employees v. Cheney, supra, 884 F.2d at 608-609, in addressing the random portions of drug testing of civilian employees of the Department of the Army:
In Von Raab and Skinner the Supreme Court laid out a balancing test that, while not self-executing, focuses our attention on a single question: Does the government's need to conduct the suspicionless searches outweigh the privacy interests of the covered employees in such a fashion that it is "impractical to require a warrant or some level of individualized suspicion?" If so, the Army's testing scheme cannot be deemed unreasonable. See Von Raab, 109 S.Ct. at 1390, 1392. Accord Skinner, 109 S.Ct. at 1414.
........
Initially, appellees ask that we find Von Raab and Skinner of "little or no impact" on the present case, since the Army tests on a random, rather than post-accident or pre-ascension basis.... To settle this contention, we need look no further than our recent decision in Harmon v. Thornburgh, 878 F.2d 484 (D.C. Cir.1989), where, while recognizing that a random plan might plausibly be considered different in kind from the programs approved by the Supreme *24 Court, we concluded that "the random nature of the [subject] testing plan is a relevant consideration," but does not "require[] us to undertake a fundamentally different analysis from that pursued by the Supreme Court." At 489 (emphasis in original).
We therefore conclude that the testing involved here does not violate the Fourth Amendment. Defendants had a qualifying "special need," in that their aim and responsibility was to insure that the public was not endangered by driving over or passing under bridges whose openings were being controlled by drug-impaired operators.[7] Here, plaintiffs' jobs had a clear impact on public safety. Plaintiffs knew that their urine was to be tested during their annual physicals, and hence had a lowered expectation of privacy (even though they did not know prior to the May 22, 1986 exam that there would be a drug test component); and they were allowed to supply the urine samples in private.
Under these circumstances, where defendants have a legal responsibility to maintain safe bridges, N.J.S.A. 27:19-10, -26, we see no reason to apply the State constitution to provide more protection to the individual employees, as opposed to the individuals who use the bridges involved. See Fraternal Order, supra, 216 N.J. Super. at 477, 524 A.2d 430. This is particularly true where we are dealing with safety concerns on bridges that span the Delaware River and are situated in two States.[8] As previously noted, Fraternal Order involved random testing which involves a much greater privacy interest *25 than a regularly scheduled annual physical, and plaintiffs do not suggest any reason as to why the state constitution requires a stricter scrutiny of the drug testing involved here than the federal constitutional values involved.
Accordingly, we conclude, that the testing program here involved is constitutional under both the federal and state law.

V.
The individual plaintiffs in this case were dismissed after a hearing before the Commission. Because of the holding of the trial judge and our reversal, various issues remain. We believe it advisable to comment on some of them for guidance on the remand.
While the fact of testing is a non-negotiable managerial prerogative, cf. Township of Bridgewater v. P.B.A. Local 174, 196 N.J. Super. 258, 261-262, 482 A.2d 183 (App.Div. 1984) (test criteria for testing physical fitness of police officers not negotiable), there is a clear distinction between the decision to test, on the one hand, and the procedure to be utilized, on the other. Id. at 261-262, 482 A.2d 183. See also N.J. State College Locals v. State Bd. of Higher Ed., 91 N.J. 18, 32-34, 449 A.2d 1244 (1982) ("procedures for implementing [non-negotiable] substantive decisions", id. at 34, 449 A.2d 1244, are negotiable). See also In re IFPTE Local 195 v. State, 88 N.J. 393, 404-405, 443 A.2d 187 (1982).[9]Cf. Consolidated Rail Corp. v. Railway Labor Exec. Assn., ___ U.S. ___, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). Hence, we do not decide that the issue of discipline *26 is non-negotiable or that it is not subject to review, where appropriate, by the Department of Personnel. Nor do we pass upon plaintiffs' claims that they have rights under the Law Against Discrimination, N.J.S.A. 10:5-4.1. While we conclude that the decision to conduct the drug testing is non-negotiable, we leave for development and resolution on remand all issues concerning the testing procedures to be utilized and the negotiability thereof, the appropriate discipline and sanctions to be imposed in this and future cases, and the forum in which these issues are to be considered.

VI.
Accordingly, the judgment is reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] A bascule is a weight which is lowered in order to raise the center portion of the bridge when necessary to permit ships to pass thereunder. (This footnote was not part of the text).
[2] The court enjoined the testing in the absence of "reasonable suspicion" but upheld it with respect to two employees where the standard was satisfied. 219 N.J. Super. at 381-382, 530 A.2d 371.
[3] The judge also rejected application of the "consent search" principle and the "public hazard" theory to sustain the searches. We do not address those issues in light of our holding.
[4] The fact that all sheriff's employees were involved in the testing in Allen did not make the testing non-random. 219 N.J. Super. at 376, 380-381, 530 A.2d 371.
[5] Further, while the record does not suggest that this case deals with a "closely regulated field," it does concern transportation and related public safety.
[6] Our Supreme Court recently declined to consider a constitutional attack on a state police urine-drug testing program, while remanding that issue for development of a factual record in light of Skinner and Von Raab. Matter of Carberry, 114 N.J. 574, 587-588, 556 A.2d 314 (1989).
[7] While the case before us has been argued under the Fourth Amendment, we note that Shoemaker v. Handel, 795 F.2d 1136 (3 Cir.1986) cert. den. 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (upholding random search of jockeys for drugs and alcohol under administrative search exception) also rejected an equal protection claim; and contentions regarding the right to privacy, free exercise of religion, and Fifth Amendment were rejected in Rushton. See 844 F.2d at 567.
[8] At oral argument we were told that the Commission was unique because it operated interstate bridges without an interstate compact. The bridges were apparently initially "constructed" and operated before 1953. See N.J.S.A. 27:19-40.
[9] Plaintiffs also attack the initial drug testing conducted here without prior notice on the grounds that it constituted a unilateral change in a term of employment. However, the record reflects the filing of no relevant petition with the Public Employees Relations Commission, and plaintiffs could not properly obtain a ruling on this subject from the Law Division. Bd. of Education of Bernards Tp. v. Bernards Tp. Ed. Assn., 79 N.J. 311, 315-316, 399 A.2d 620 (1979); Ridgefield Park Ed. Assn. v. Ridgefield Park Bd. of Ed., 78 N.J. 144, 154-155, 393 A.2d 278 (1978).