707 A.2d 1377

JOHN REAMES, PETITIONER–APPELLANT, v.
DEPARTMENT OF PUBLIC WORKS, CITY
OF PATERSON, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted March 10, 1998—Decided March 24, 1998.

Before Judges PRESSLER, WALLACE and CARCHMAN.

*Kathleen A. Mazzouccolo,* attorney for appellant.

*Susan E. Champion,* Corporation Counsel, attorney for respondent City of Paterson Department of Public Works (*Frank Covello,* of counsel and on the brief).

*Peter Verniero,* Attorney General, attorney for respondent Merit System Board (*June K. Forrest,* Senior Deputy Attorney General, on the Statement In Lieu of Brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

This appeal raises questions respecting the random drug testing required by federal law, 49 *U.S.C.A.* § 31306 and its implementing regulations, for operators of commercial motor vehicles holding a commercial driver's license (CDL). In sum, petitioner John Reames, a then twenty-four-year employee of respondent Department of Public Works of the City of Paterson (DPW), was terminated by his employer for his asserted refusal to submit to a random drug test, and that termination was affirmed by the initial decision of an administrative law judge (ALJ) following a contested hearing and, in turn, by the Merit System Board, which accepted the ALJ's findings of fact and conclusion. He appeals and we reverse. We are satisfied that the DPW's total failure to comply with the testing policies and procedures mandated by the

applicable federal regulations resulted in irremediable constitutional infirmities in the test here conducted, rendering it an unreasonable search and seizure.

Much of the salient factual background is undisputed. As noted, petitioner is the holder of a CDL authorizing him to drive vehicles whose weight exceeds 32,000 pounds. On the morning of September 25, 1995, the DPW Director, Juan Santana, purporting to be doing so in compliance with federal law, radioed all employees of the department holding a CDL instructing them to proceed immediately from wherever they were and from whatever they were doing, to the DPW garage. About fifty employees, including petitioner, assembled there. When they had all arrived and a roll call had been taken, Santana advised them that, pursuant to federal law, they were then and there being required to submit to drug testing by supplying a urine sample. According to his testimony,

> I informed all the employees as to why I had called them in. I indicated to them that there was a specific law that required all employers to test any employee that had a CDL license and that they were there for that purpose.

> I explained to them that the general policy—it was the policy itself, I indicated that I had to do this and what we were going to do is test everybody. That failure to take the test would be an admission. I also told them that they had an opportunity to come forth, because we do have a policy which indicates that if you come forth and you volunteer, you can go on rehab. I explained to them you have—and I reiterated several times that, please come forth now.

Respondent concedes that this was the first notice given to DPW employees holding a CDL of the random drug testing required by federal law or of the fact that a random test would be administered.

Accompanying Santana for the purpose of administering the test were two Paterson police officers and an employee, Mark Marlow, who was both a clerk in the personnel department and a part-time radio dispatcher for DPW. The municipal attorney was also present. There was no medically certified person on the premises. The request by at least one of the employees that a union representative be permitted to attend the proceedings was denied. According to Santana, the test procedure involved one of

the police officers accompanying the employees, one by one, to a bathroom in the garage. Although the procedure must have taken some time, Santana, respondent's sole witness at the hearing, spent much of it in his office and only looked into the bathroom once. He saw that the door of the stall being used for the specimen collection was open and that the police officer was standing directly behind the employee, facing in the same direction as the employee while the specimen was being produced. Petitioner testified that as he was trying to produce a specimen, he was aware that the police officer was watching his attempt to urinate, making it impossible for him to do so. Another employee who was tested that morning also testified that the officer was observing the actual act of urination. Although the ALJ made no factual finding as to just how intrusive the observations of the police officer were, Santana himself conceded on cross-examination that the collection of the specimen was performed without affording the employee either privacy or dignity. We also understand from this record that Marlow's role was to seal the specimen jars, obtain the necessary signatures, take care of the paper work, and transport the specimens to the DPW's contract laboratory. The record does not indicate his training for or experience in performing these functions.

We return to petitioner's conduct during the testing procedure. His version and Santana's are widely disparate. According to petitioner, he had no conversation with Santana before the test and certainly had made no inculpatory statements to him. Rather, when he was assertedly unable to produce a specimen by reason of the officer's close observation of his attempt to do so, the officer called Santana, told Santana that petitioner had refused to take the test, and Santana immediately suspended him. Petitioner further asserted that he was not offered the opportunity to consume liquids and then to try again. Santana testified, however, that petitioner told him he was not going to take the test because he was on crack cocaine, and in fact, he, Santana, noticed that petitioner's eyes were glassy and ready to "pop out," leading him to believe that petitioner was under the influence of drugs.

In any event, both agree that petitioner then left the garage in a DPW vehicle, was instructed by radio to come back to the garage, and did so. It was only then, according to Santana, and after the testing had been completed, that he gave petitioner a so-called *Loudermill* [1] hearing, advising him that he was forthwith suspended without pay until the hearing on the charges that were to be brought against him. Petitioner's offer to take a drug test the following day was rejected.

A Preliminary Notice of Disciplinary Action was served on petitioner several days later, charging him as follows:

Charge I

1. Violation of [*N.J.A.C.*] 4A:2–2.3(a)(2)—insubordination
2. Violation of 4A:2–2.3(a)(3)—inability to perform
3. Violation of 4A:2–2.3(a)(10)—violation of City of Paterson anti-drug use policy as described in Charge II;

Charge II

1. Violation of Administrative Policy VIII(15)—use of illegal drugs while conducting City of Paterson business.
2. Violation of Administrative Policy VIII(15)—refusal to submit to drug test.

The charges were sustained by the employer, who imposed the penalty of dismissal. The ALJ found petitioner guilty of all the elements of Charge I based solely on his refusal to submit to the test. More particularly, the ALJ upheld the charge of insubordination based on the refusal. She upheld the charge of inability to perform based on the finding that "the [federal] regulations prohibit an employer from allowing a driver who refuses to submit to the test to perform safety sensitive functions." The ALJ, however, dismissed the charge of actual drug use on the ground that Santana's "glassy-eyed" testimony constituted insufficient proof thereof. The ALJ sustained the dismissal penalty, and her findings and conclusions were accepted by the Merit System Board.

---

[1] *Cleveland Bd. of Educ. v. Loudermill,* 470 *U.S.* 532, 105 *S.Ct.* 1487, 84 *L.Ed.*2d 494 (1985).

In concluding that the random drug test that was the basis of the dismissal here did not pass constitutional muster, we note first petitioner's apparent concession that properly implemented and administered random drug testing under federal law of holders of CDLs is constitutionally permissible both as a matter of the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution. His complaint focuses rather on the manner in which the test was conducted and the DPW's failure to have preceded the drug testing by the adoption and dissemination to the employees of a detailed written policy complying with federal regulations. He asserts that the DPW's gross deviation from federal requirements in these regards resulted in the test constituting an unreasonable search and seizure. We agree with both these propositions.

With respect to the basic theoretical issue of the constitutionality of random drug testing of holders of CDLs, we need only note the following. The United States Supreme Court has made it clear that the Fourth Amendment is not violated by a program of random drug testing of employees where the government can demonstrate a special need based on the safety-sensitive functions they perform. *See Skinner v. Railway Labor Exec. Ass'n*, 489 *U.S.* 602, 109 *S.Ct.* 1402, 103 *L.Ed.*2d 639 (1989) (upholding regulations of the Federal Railroad Administration mandating blood and urine tests of railroad workers involved in specified types of train accidents); *Treasury Employees v. Von Raab*, 489 *U.S.* 656, 109 *S.Ct.* 1384, 103 *L.Ed.*2d 685 (1989) (upholding a drug testing program for employees of the United States Custom Service applying for transfer or promotion to positions involving drugs, firearms, or classified materials); *Chandler v. Miller*, 520 *U.S.* 305, 117 *S.Ct.* 1295, 137 *L.Ed.*2d 513 (1997) (invalidating a state law mandating drug testing of candidates for public office while reaffirming the principle that drug testing is permissible where the risk to public safety is substantial and real). And in *NJ Transit PBA Local 304 v. NJ Transit Corp.*, 151 *N.J.* 531, 701 *A.*2d 1243 (1997), involving the random drug testing of armed transit police, the New Jersey Supreme Court adopted, for pur-

poses of the New Jersey search and seizure proscription, the special needs test based on substantial considerations of public safety, particularly where the employees are engaged in a highly regulated industry. *See also Local 194A v. Bridge Comm'n,* 240 *N.J.Super.* 9, 22–25, 572 *A.*2d 204 (App.Div.), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990) (approving drug testing for bridge openers as part of an annual physical and concluding that random drug testing would be constitutionally permissible).

The federal government has concluded that drivers of commercial vehicles who are under the influence of drugs or alcohol pose a substantial threat to the public safety. As noted by *Keaveney v. Town of Brookline,* 937 *F.Supp.* 975, 980–981 (D.Mass.1996):

> This concern is supported by statistics published by the Department of Transportation in its preamble to the drug screening regulations. That document states that "drivers of heavy and medium trucks with measurable alcohol concentrations are involved in about 750 fatal crashes annually, along with another 7,700 crashes resulting in personal injuries and 4,750 crashes involving only property damage." Limitation on Alcohol Use by Transportation Workers, 59 Fed.Reg. 7301, 7308 (February 15, 1994). In addition, the Department of Transportation notes that "an on-the-job accident is four times more costly than one that occurs in a personal vehicle, with an average cost to employers of $168,000 for a fatal accident and $6,900 for a non-fatal accident." *Id.* at 7308. Congress chose to require random testing of commercial drivers, in particular, based on its finding that random testing is "the most effective deterrent to abuse of alcohol and use of illegal drugs." Pub.L. No. 102–143, § 2(5), 1991 U.S.C.C.A.N. (105 Stat.) 952, 953.

Accordingly, 49 *U.S.C.A.* § 31306(b)(1)(A) mandates that

> [i]n the interest of commercial motor vehicle safety, the Secretary of Transportation shall prescribe regulations that establish a program requiring motor carriers to conduct preemployment, reasonable suspicion, random, and post-accident testing of operators of commercial motor vehicles for the use of a controlled substance in violation of law or a United States Government regulation and to conduct reasonable suspicion, random, and post-accident testing of such operators for the use of alcohol in violation of law or a United States Government regulation. The regulations shall permit such motor carriers to conduct preemployment testing of such employees for the use of alcohol.

Implementing regulations were adopted as 49 *C.F.R.* ch. III, Part 382, incorporating 49 *C.F.R.,* Subtitle A, Part 40, which prescribes detailed procedures for the conduct of workplace drug testing programs.

Despite whatever open question there might be as to whether holders of CDL licenses would be otherwise subject to random drug testing under art. 1, ¶ 7 of the *N.J. Const.*, the apparent assumption of the parties is that 49 *U.S.C.A.* § 31306 and its implementing regulations are preemptive, requiring compliance by all employers of CDL licensees. We are satisfied that that assumption is correct in view of the broad and express preemption provision of section (g) of the statute, stating that

[a] State or local government may not prescribe or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this section. However, a regulation prescribed under this section may not be construed to preempt a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property.

See also the preemption provision of 49 *C.F.R.* § 382.109. We agree with Judge Keeton's preemption rationale in *Keaveney, supra,* 937 *F.Supp.* at 982, namely that

[t]he scope of this language [section (g)] is broad. It encompasses situations where a State law attempts to regulate in the same area as a federal law, but in a contradictory manner. It also encompasses situations where the enforcement of a State law might thwart the intention of Congress. In addition, the Department of Transportation has stated that "the purpose of preemption is to avoid the confusion and expense of inconsistent requirements for employers or testing entities that operate in several States...." 59 Fed.Reg. 7317. I conclude that the Act's preemptive language is clear: any state law provisions, the enforcement of which would obstruct the deterrent effect of this legislation or the nationwide uniformity of testing rules, are pre-empted.

We recognize that the New Jersey Supreme Court in *NJ Transit, supra,* 151 *N.J.* at 541–542 n. 2, 701 *A.2d* 1243, left open the question of whether a similarly phrased provision of the Omnibus Transportation Employment Testing Act of 1991, 49 *U.S.C.A.* § 5331(f)(1), is preemptive of state law. We note, however, as the Supreme Court explained, that the drug testing provided for by that Act for mass transportation workers, including the New Jersey Transit police, was not absolutely mandated for the states since 49 *U.S.C.A.* § 5331(g) provides only that failure to establish the prescribed drug testing program would result in loss of eligibility for federal financial transportation assistance. *NJ Transit, supra,* 151 *N.J.* at 536, 701 *A.2d* 1243. 49 *U.S.C.A.* § 31306, on the other hand, offers no such choice. It provides no

exception to the federal mandate for random drug testing of holders of CDL licenses and expressly applies to all employers of CDL licensees.

Beyond that, however, the federal statutory and regulatory scheme is of critical significance here because, whether absolutely and preemptively mandated for all employers or not, the Paterson DPW has, from the very outset, taken the position that its random drug testing program for CDL licensees, initiated on the day of the random drug testing here in issue, was undertaken in compliance with the perceived preemptive federal mandate. To that extent, if for no other reason, we think it plain that the drug testing was required to comply with federal requirements. It utterly failed to do so.

We note first that at the time the drug testing was announced and performed, the City had no written policy or statement of procedures whatsoever regarding *random* drug testing. It is true that pursuant to Governor Kean's Executive Order Number 204, effective March 1989, respecting workplace drug and alcohol abuse, the City of Paterson had adopted a detailed Anti–Drug and Alcohol Policy. We regard that Policy, however, as irrelevant here since it is limited to substance testing only "for cause," defined as either individualized suspicion or upon an employee's direct involvement "in a serious incident while on duty, without regard to whether there is any reason to believe either drugs or alcohol was a contributing factor...." *Anti–Drug and Alcohol Policy*, section 4B. In constitutional terms, for-cause drug testing and random drug testing are obviously worlds apart—the first is now virtually routine, involving no legitimate search and seizure challenge, while the second is always suspect, requiring clear justification on the basis of special needs grounded in public safety. *See, e.g., Fraternal Order of Police v. City of Newark*, 216 *N.J.Super.* 461, 524 *A.2d* 430 (App.Div.1987). There was, consequently, no written City policy respecting random drug testing.

We compare then what was, in effect, the entirely *ad hoc* random drug testing here conducted with the requirements of

federal regulations promulgated pursuant to 49 *U.S.C.A.* § 31306. To begin with, 49 *C.F.R.* § 382.105 requires that testing comply with the procedures set forth in Part 40. These procedures were ignored. For example, § 40.23(d)(1) requires written procedures, instructions and training of the "collection site person" who is "responsible for maintaining the integrity of the specimen collection and transfer process [and] ensuring the modesty and privacy of the donor...." § 40.23(d)(2) requires that the collection site person be either a licensed medical professional or properly instructed technician or other person who "shall have successfully completed training to carry out this function." § 40.25(a)(2), governing specimen collection procedures, requires that the designated collection site "shall be a location having an enclosure within which private urination can occur...." Strict rules are provided by § 40.25(e) defining the exceptional circumstances and procedures pursuant to which specimen production may be subject to direct observation. § 40.25(d) permits only the trained or licensed collection site person to monitor or observe specimen collection. § 40.25(f)(10)(iv)(A)(2) requires that an employee who is unable to produce an adequate specimen be given up to 40 ounces of fluids to drink over a three-hour period and is assumed to have refused to be tested only if no adequate specimen is produced after that time, unless an immediate medical examination confirms the employee's inability. In sum, Part 40 is a lengthy, detailed document designed to ensure the integrity of the process and to protect the employee from any greater privacy intrusion than is compelled by the objectives of the program. The herding by the DPW of its 50 or so CDL licensees in the central garage, the described specimen collection process under direct observation of the police officers, and the failure of proof that Marlow was trained as required made a mockery out of Part 40 of the *C.F.R.*

Even more significant, however, than the mechanical failures of specimen collection, was the City's complete failure to comply with the mandates of Part 382. Without belaboring the point, we need only refer to § 382.601, which requires the employer, prior to testing, to provide each employee with educational materials ex-

plaining the employer's policies and procedures for testing and to obtain a signed statement from each employee certifying to receipt of this material. The employer is also required to provide union representatives with notice of the availability of these materials, and the minimum required contents of these materials are specified in eleven separately numbered paragraphs. Moreover, § 382.605 contains specific and detailed rehabilitation provisions. None of these requirements was complied with.

■ We think it plain that while considerations of public safety may justify the privacy intrusion implicit in random drug testing, nevertheless that intrusion can be constitutionally acceptable only if it comports with prior promulgated and disseminated procedures and policies designed to limit that intrusion to the maximum extent compatible with the program's efficacy. These procedures and policies are the necessary counterbalance to the intrusion into the employee's privacy interests and, without them, the intrusion is constitutionally unsustainable. That conclusion is supported by the Supreme Court's emphasis in *NJ Transit, supra,* on the detailed Core Policy governing the random drug testing there sustained. It is mandated here by the federal regulations governing random drug testing of CDL licensees.

■ The random drug testing was done here without the benefit of an acceptable and complying protocol. The federal regulations were disregarded in significant particulars. Irrespective of whatever conceptual constitutional validity may be accorded to a program for randomly drug testing CDL licensees, the practical validity of such a program requires substantial compliance with federally prescribed procedures.[2] We therefore conclude that the

---

[2] We recognize that *N.J.A.C.* 4A:2–2.3(a)(10) subjects a public employee to discipline for "[v]iolation of Federal regulations concerning drug and alcohol use by and testing of employees who perform functions related to the operation of commercial motor vehicles, and State and local policies issued thereunder...." We are, however, satisfied that this rule was not intended to apply to random drug testing conducted by a public employer in violation of federal regulation.

random drug testing conducted in the DPW garage on September 25, 1995, was constitutionally defective.

Petitioner was dismissed for insubordination based on his refusal to take a random drug test.[3]  Whether he could not submit to the test, as he claims, or whether he chose not to submit, as the City claims and the ALJ found, is of little moment.  An employee cannot be dismissed for failure to submit to a procedure violative of his state and federal constitutional rights.  The test administered here constituted such a violation.

The determination of the Merit System Board sustaining petitioner's dismissal as an employee of the Department of Public Works of the City of Paterson is reversed.  We remand for a determination of the job and financial rights to which he is consequently entitled.

---

[3] There was a suggestion at the OAL hearing that petitioner had committed a serious disciplinary infraction by leaving the garage in a DPW vehicle contrary to instructions.  He was not charged with that infraction, and we do not consider it.